IN THE SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| WELLS FARGO BANK, a National Banking Association, | ) ) ) | Supreme Court No. CV-00-0062-PR |
|     Plaintiff-Counterdefendant-Appellee, | ) ) ) | Court of Appeals No. 1 CA-CV 99-0184 |
|               v. | ) ) ) | Maricopa County Superior Court No. CV 97-06648 |
| ARIZONA LABORERS, TEAMSTERS AND CEMENT MASONS LOCAL NO. 395 PENSION TRUST FUND; ARIZONA LABORERS, TEAMSTERS AND CEMENT MASONS LOCAL NO. 395 DEFINED CONTRIBUTION PENSION TRUST FUND; ARIZONA OPERATING ENGINEERS DEFINED BENEFIT PENSION TRUST FUND; ARIZONA OPERATING ENGINEERS DEFINED CONTRIBUTION PENSION TRUST FUND; ARIZONA STATE CARPENTERS PENSION TRUST FUND; ARIZONA STATE CARPENTERS DEFINED CONTRIBUTION PENSION TRUST FUND; McMORGAN & COMPANY, a California corporation, as Managing Agent of the Funds, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **O P I N I O N** |
|     Defendants-Counterclaimants-Appellants. | ) ) ) | |

Appeal from the Superior Court of Maricopa County

Honorable Steven D. Sheldon, Judge

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

_____

Court of Appeals, Division One
AFFIRMED IN PART; VACATED IN PART

_____

Lewis and Roca LLP                                          Phoenix
 by  John P. Frank
     Peter Baird
     Randy Papetti
     Barry Willits
Attorneys for Plaintiff-Counterdefendant-Appellee

Morrison & Hecker L.L.P.                                    Phoenix
 by  Michael C. Manning
     James W. Howard
     Monty L. Greek
Attorneys for Defendants-Counterclaimants-Appellants

_____

**J O N E S, Chief Justice**

**I.    Facts and Procedural History**

¶1          This controversy arises under a triparty agreement
between First Interstate Bank ("the Bank"),[1] various union pension
funds ("the Funds"), and Mercado Developers, a partnership headed
by J. Fife Symington, III ("Symington").  In 1987, the Bank funded
a $2.3 million loan to a separate Symington partnership for a strip
mall development named Alta Mesa Village.  The Funds were not
involved in the Alta Mesa transaction.  Later the same year,
Symington approached the Bank to request financing for a
construction project in downtown Phoenix called the Mercado Project
("the Mercado").[2]  The Bank determined not to provide permanent

---

[1]  During the course of this litigation, First Interstate Bank
was purchased by Wells Fargo Bank and now does business under the
latter name.

[2]  The borrower was Mercado Developers Limited Partnership, an
Arizona general partnership, of which Symington was one of the
general partners.  Symington was also a personal guarantor of both

financing for the Mercado but offered Symington interim construction financing if he were able to secure permanent financing from another lender. The Funds agreed to be that lender.

¶2        The Bank's obligation to fund the construction loan arose the moment Symington secured a commitment from the Funds (the "Permanent Commitment").[3] At the Bank's request, in May 1988, the Bank, the Funds, and Symington executed a Triparty Agreement setting forth the rights and obligations of each party. Among other things, the Agreement provided that the Bank would fund $10 million for construction of the Mercado, but that no later than June 30, 1990, the Funds would "take-out" the Bank's interim loan with permanent financing.[4] After the take-out, Symington would be obligated to the Funds under the Permanent Commitment. The Funds' obligation was conditioned on review and approval of Symington's

---

the Mercado loan and the Alta Mesa loan. Symington is not a party to this action.

[3] Triparty Agreement § 1.3. "Construction Lender, in reliance upon the Permanent Commitment, has agreed to lend the sum of $10,000,000.00 as interim financing (the 'Construction Loan') . . . ."

[4] Triparty Agreement § 3.5. "Upon the Take-Out Date, provided all of the terms, conditions and provisions of the Permanent Commitment shall have been satisfied, or Permanent Lender shall have waived satisfaction of such conditions or shall have agreed to fund the Permanent Loan without complete satisfaction of such conditions . . . Permanent Lender shall fund the Permanent Loan by disbursing to Construction Lender the sum necessary to repay the Construction Loan . . . ."

financial status.[5]  The Funds could refuse the loan if contract conditions were not met or if the Funds were dissatisfied with Symington's financial condition.  For example, the Funds could terminate the Permanent Commitment if Symington were to become insolvent, make an assignment for the benefit of creditors, or fail to pay debts as they matured.[6]  In addition, pursuant to the terms of the Triparty Agreement, the Funds were entitled, on request, to receive financial information from the Bank on the status of the

---

[5]Permanent Commitment ¶ 28.  "FINANCIAL STATEMENTS/CREDIT REPORTS: Within thirty (30) days following acceptance of this Commitment letter, Borrower and Borrower's partners shall provide Lender with satisfactory and current financial statements and credit reports (dated not more than six (6) months prior to the date hereof) demonstrating to Lender's complete satisfaction the Borrower's financial stability and creditworthiness.  Borrower and Borrower's partners shall provide Lender with updated statements and reports (dated not more than six (6) months prior to the Loan Funding Date) . . . ."

[6] Permanent Commitment ¶ 29.  "FINANCIAL CONDITION:  Lender may terminate this Commitment by written notice to you in the event that (i) the Borrower, any partner of Borrower, any guarantor of Borrower's obligation, or any affiliate of Borrower . . . whose activities have material effect on the financial capabilities of Borrower, . . . (collectively referred to in this paragraph as 'Debtor') shall make an assignment for the benefit of creditors; (ii) an application or petition is filed for the appointment of a custodian, trustee, receiver or agent to take possession of the real estate or any other property of Debtor; (iii) Debtor is generally not paying Debtor's debts as such debts become due; (iv) Debtor becomes 'insolvent' as that term is defined in . . . the 'Bankruptcy Code'. . .; (v) Debtor shall file a petition with the bankruptcy court under the Bankruptcy Code, or commence any proceeding relating to Debtor under any bankruptcy or reorganization statute or under any arrangement . . . ."

-4-

Mercado construction loan.[7] The Bank was not required to volunteer information to the Funds;[8] Symington, however, was expressly obligated to provide specific financial information to the Funds.

¶3      By early 1989, the Phoenix real estate market began to experience a catastrophic decline, and Symington's real estate endeavors were not immune from the trauma.  The loan balance on Symington's Alta Mesa development came due in March 1989, and because of the project's lackluster performance, Symington was unable to satisfy the obligation.  The loan appeared on the Bank's "Watch Report" for the first time in March 1989.  The Watch Report is an internal bank document that monitors problem loans.  In exchange for a fee, the Bank extended the loan until September 1, 1989.  The loan was subsequently twice extended:  on September 1 and December 1, 1989.[9]  When the obligation ultimately matured on

---

[7]  Triparty Agreement § 2.1.  ". . . Construction Lender will provide Permanent Lender with copies of architect's certifications, builder's certifications, certificates of occupancy issued by any municipality, lien waivers, and such other documents or information relating to the Construction Loan as Permanent Lender may reasonably request, provided that Construction Lender shall have obtained such items in the normal course of its administration of the Construction Loan, or can obtain such items without undue expense . . . ."

[8] Triparty Agreement § 5.1.  ". . . Construction Lender shall have no obligation to comply with any of the terms, conditions and provisions of Permanent Commitment but may, at its election, satisfy such requirements on behalf of Borrower in any manner not inconsistent with this Agreement."

[9]  The September 1, 1989, loan extension request included a printout of Symington's related commitments to the Bank, including the Mercado loan.

March 15, 1990, Symington was still unable to pay, and the loan defaulted at the conclusion of business that day.

¶4 The events that occurred between late 1989 and July 1990, and the effect of those events on the Funds' ultimate decision to fund the Mercado permanent loan are at the core of this lawsuit. The Funds claim that, during these months, actions were carried out by Symington and the Bank that were intended to cloak Symington with a false appearance of financial vigor and to deprive the Funds of any reason to refuse to fund the Permanent Commitment. The Bank, of course, was concerned and anxious to obtain repayment of the $10 million Mercado construction loan. The Bank contends what it did to ensure the permanent loan was lawful, that by securing the take-out, it was merely protecting its own interests, that it was unaware of any fraudulent behavior by Symington, and that in any event, it had no legal duty to the Funds to inform them of anything.

¶5 Prior to March 1990, the Bank explored the option of foreclosing the defaulted Alta Mesa loan, selling the property, and issuing a deficiency notice to Symington. The Bank discussed this proposal with Symington and asked him to submit a Business Plan with recommendations for handling the troubled loan. In response, on March 16, 1990, one day after the latest Alta Mesa loan extension expired, Symington aide James Cockerham sent a letter to the Bank suggesting that the Bank should take a cooperative

approach to stabilize the Alta Mesa loan because "[f]oreclosure by FIB [First Interstate Bank] and/or an assignment for the benefit of creditors could have a detrimental impact to both the Partners and FIB." In his deposition, Cockerham acknowledged that one potential detrimental impact would be to give the Funds a basis on which to refuse to fund the permanent Mercado loan.

¶6     While Symington was attempting to salvage Alta Mesa, the June 30, 1990, date on which the Funds were required to retire the Mercado construction loan drew nearer. On or about May 4, 1990, as part of his obligation under the Permanent Commitment, Symington provided a certified financial statement to the Funds, current through December 31, 1989. According to the Funds, they later learned that the financial statement was false and included exaggerated values and omissions, giving Symington a specious appearance of solvency. Among other things, the financial statement did not mention the financial troubles afflicting Alta Mesa, nor did it mention the three extensions on that loan. In fact, Symington asserted the same personal equity in the Alta Mesa project that he reported on the statement given the Funds in 1987 to secure the permanent commitment.

¶7     On May 21, 1990, Doug Hawes, the Bank's Alta Mesa loan officer, requested approval once again to extend the Alta Mesa loan, this time through July 1, 1990 -- one day after the Funds were required to take-out the Bank's interim loan on Mercado. One

reason given by Hawes for the requested forbearance was to "[a]llow time for finalization of the Mercado loan pay-off . . . ." On May 25, the Bank consented to Hawes' request and executed, in Symington's favor, a forbearance agreement on the Alta Mesa loan until July 1, 1990.

¶8        Less than two weeks later, on June 7, 1990, Jeff White, the Bank's Mercado loan officer, submitted a memo to the Bank's Senior Loan Committee detailing Symington's deteriorated financial condition and requesting authority to charge off $1.2 million of the Mercado construction loan that would not be paid by the Funds.[10] White's memo indicated that property values listed on Symington's most current financial statements "do not accurately reflect the current market" and that "[c]ontingent debt also appears not to have been fully accounted for on his recent statement." Ward Wilson, a member of the Senior Loan Committee, testified that the Bank was concerned about intentional misstatements by Symington. Before agreeing to accept less than the full $10 million, the Bank requested an updated financial statement from Symington. In fact, in an attempt to avoid the $1.2 million shortfall, the Bank convened a meeting the next day, June 8, 1990, attended by, among

---

[10] The shortfall occurred after the Funds exercised their right to hold back nearly $1.2 million for tenant improvements and interest reserves. Symington remained liable to the Bank for the shortfall, so the Bank asked the Funds for a subordinate third lien on the Mercado property to secure the shortfall. The Funds agreed but demanded that Symington extend his personal guarantee to them for another six years.

others, Sam Coppersmith, counsel for the Funds. Discussion of the shortfall was had but the meeting appears to have been unsuccessful from the Bank's standpoint.

**¶9** At the Bank's request, Symington resubmitted his financial statement on June 26, 1990. With minor revisions, this statement contained the same numbers that appeared on the May 4, 1990 statement. Ward Wilson testified the Bank's concern was "heightened" at this point, and when asked whether the Bank knew Symington had provided the same financial numbers to the Funds, Jeff White testified that he "would hope so."

**¶10** Evidence also disclosed significant banking irregularities, allegedly in violation of federal banking regulations and the established internal procedure within the Bank. The Funds' banking expert, Jeffrey Gaia, provided a declaration that the Bank's forbearance from enforcement of the Alta Mesa loan was contrary to prudent banking practice for purposes of securing the Mercado take-out. Robert Lee Creed, the Bank's own employee, testified that a forbearance not accompanied by a credit authorization request is unusual if, as here, it extends the maturity of the loan. The Alta Mesa forbearance was not accompanied by a credit authorization request. In addition, the Bank failed to report Symington's false representations to federal banking officials as required by federal regulations, where the Bank was admittedly knowledgeable of the false financial statement.

*See* 31 C.F.R. ¶ 103.18 (2001).

**¶11** Finally, on June 29, 1990, against the background of a real estate market suffocating from defaulted loans and foreclosures and with Symington's financial condition in grave difficulty, the Funds complied with the terms of the Permanent Commitment and funded the Mercado loan. Symington defaulted on the loan in 1992. In 1993, the Funds foreclosed on Mercado and wiped out the subordinate lien held by the Bank. The Funds obtained judgment against Symington personally in 1995, after which he filed for bankruptcy.[11]

**¶12** The Funds later accused the Bank of wrongdoing, and the Bank filed a complaint seeking a declaratory judgment that it had complied with and performed all of its contractual obligations. The Funds counterclaimed, charging the Bank with (1) aiding and abetting fraud, (2) breach of the implied contractual covenant of good faith and fair dealing, (3) intentional interference with contractual relations, (4) fraudulent concealment, and (5) civil conspiracy. The trial court entered summary judgment for the Bank on all claims and awarded fees, finding that the Bank owed no

---

[11] On February 16, 2001, U.S. Bankruptcy Court Judge George B. Nielsen issued an order that Symington's debt to the Funds will not be discharged by his declaration of personal bankruptcy. Judge Nielsen upheld the Funds' claim that Symington submitted false financial statements. The judge's finding preserves Symington's liability for the debt. *See In re J. Fife Symington, III*, B-95-08397-PHX-GBN; *Norwest Bank (Minnesota), N.A. v. J. Fife Symington, III*, Adv. No. 96-523-GBN (February 16, 2001, order).

fiduciary or contractual duty to the Funds to disclose information about Symington's financial condition. The court of appeals affirmed. The Funds petitioned this court and we granted review. We have jurisdiction pursuant to Arizona Constitution article VI, section 5(3).

## II.  Analysis

### A.  Summary Judgment Standard

¶13     This court reviews *de novo* a grant of summary judgment, views the evidence and reasonable inferences in the light most favorable to the party opposing the motion, and the inferences must be construed in favor of that party. *Thompson v. Better-Bilt Aluminum Prod. Co., Inc.,* 171 Ariz. 550, 558, 832 P.2d 203, 211 (1992).

¶14     Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. Rule 56(c); *Orme School v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). Thus, in the case at bar, summary judgment should have been granted on the Bank's motion only if the facts produced in support of the Funds' claims "have so little probative value [given the quantum of evidence required] . . . that reasonable people could not agree with the conclusion advanced" by the Funds. *Baker v. Stewart Title & Trust of Phoenix, Inc.*, 197 Ariz. 535, 540, 5 P.3d 249, 254 ¶15 (App. 2000) (quoting *Orme School*, 166 Ariz. at 309, 802 P.2d at

1008). We review the claims presented in the instant case pursuant to the foregoing standard.

### B.    The "Duty" Concept

¶15    The Funds assert five distinct tort claims. On page 6 of the trial court's final order dated October 13, 1998, awarding summary judgment to the Bank on all claims, the court reasoned that

> no "special relationship" was created that placed an affirmative duty upon the Bank to disclose its "suspicions" or "speculations" about Symington's financial condition or commercial real estate "adventures" to a third-party, sophisticated lender which clearly had potential conflicting financial interests to the Banks [sic].

The trial court relied on *Kesselman v. National Bank of Arizona*, 188 Ariz. 419, 937 P.2d 341 (App. 1996).

¶16    The court of appeals followed similar reasoning, finding that the Bank's duty to disclose information regarding the Alta Mesa loan existed only to the extent that the Permanent Commitment and Triparty Agreement allowed the Funds to obtain that information by request from Symington and the Bank. The appellate court resorted to a lack of duty to disclose rationale to affirm summary judgment on all five of the Funds' claims, even though it specifically applied that lack of duty analysis only to the Funds' allegations on two of the five, fraudulent concealment and conspiracy.

¶17    We conclude that the lower courts erred. This is a case

-12-

alleging intentional conduct and thus not a duty case in the traditional sense.  It was improper to award summary judgment to the Bank on that basis.

### 1.    Duty Not Required For Intentional Torts

**¶18**        All claims alleged by the Funds constitute intentional torts.  Cases relied on by the court of appeals to require a duty to disclose were either negligence cases or cases of simple nondisclosure. *California Architectural Bldg. Prods. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472 (9th Cir. 1987) (failure to disclose); *Smith v. American Nat'l Bank and Trust Co.*, 982 F.2d 936 (6th Cir. 1992) (nondisclosure); *Banco Espanol de Credito v. Security Pac. Nat'l Bank*, 973 F.2d 51, 56 (2d Cir. 1992), *cert. denied*, 509 U.S. 903 (1993) (nondisclosure).  Although the Funds' counterclaim included an allegation of nondisclosure, summary dismissal of that claim was apparently not appealed to the court of appeals, nor was that claim raised in the Funds' petition for review to this court.

**¶19**        Negligence and nondisclosure claims differ from the intentional tort claims on review here; each has different elements and different requirements of proof.  For example, numerous decisions expressly distinguish between mere nondisclosure and intentional concealment.  *See United States v. Colton*, 231 F.3d 890, 899 (4th Cir. 2000).  Unlike simple nondisclosure, a party may be liable for acts taken to conceal, mislead or otherwise deceive,

even in the absence of a fiduciary, statutory, or other legal duty to disclose. *Id*. at 898; *see also* W. PAGE KEETON, ET AL., PROSSER AND KEETON ON TORTS § 106 (5th ed. 1984) ("Prosser V").

¶**20**       Moreover, duty, in the traditional sense, is a specific concept applicable to the law of negligence, not to intentional torts. *See* DAN B. DOBBS, THE LAW OF TORTS ch. 3, § 26, pp. 50-51 (2000) ("Intent and negligence are entirely different concepts."). One of the basic elements of a *negligence* cause of action is that the defendant owed the plaintiff a duty of care. *Id.* at ch. 6, § 114, p. 269.  Case law is replete with illustrations of this basic concept. *See Purvis v. Hamwi*, 828 F. Supp. 1479, 1483 (D. Colo. 1993) ("[A] finding of duty is necessary only for . . . claims in negligence; . . . claims for intentional torts require no traditional finding of duty . . . ."); *see also Almand v. Benton County, Ark.*, 145 B.R. 608, 617 (W.D. Ark. 1992) (an attorney would be liable for negligence only to those to whom he owed a duty but would be liable for intentional misrepresentation or fraud to anyone); *Taylor v. California State Auto. Ass'n Inter-Ins. Bureau*, 240 Cal. Rptr. 107, 113 (App. 1987) (distinguishing negligent infliction of emotional distress from intentional infliction of emotional distress, as the former must be predicated on the existence of a duty); *Waters v. Autuori*, 676 A.2d 357, 367 (Conn. 1996) (Berdon, J., dissenting) ("Duty is an element of *negligence*, but is not an element of *an intentional tort*."), *citing*

PROSSER V § 30 (italics in original); *Smith v. Calvary Christian Church*, 592 N.W.2d 713, 721 (Mich. App. 1998) (plaintiff need not prove duty in proving intentional torts), *appeal granted*, 607 N.W.2d 721 (Mich. 2000), *judgment rev'd on other grounds*, 614 N.W.2d 590 (Mich. 2000).

¶21     As the *Purvis* court most appropriately stated, "[I]t would be anomalous to invoke a lack of a specific duty in dismissing a complaint for an intentional act . . . . The duty, if it must be so named, is obviously to refrain from intentional harm to others.  At the level of intent, reference to duty becomes . . . needlessly academic . . . ."  828 F. Supp. at 1483-84.

### 2.  *Kesselman* Is Inapposite and Distinguishable

¶22     The primary case relied on by the lower courts, *Kesselman,* dealt solely with negligence-based claims that required a predicate legal duty and is thus not applicable to the intentional tort claims raised by the Funds. *Kesselman*, 188 Ariz. at 419, 937 P.2d at 341.  Moreover, *Kesselman* is distinguishable on its facts.

¶23     *Kesselman* involved no intentional tort claims.  It held simply that a bank, under a negligence standard, is under no duty to private investors to take affirmative measures to avoid loss caused by check kiting by the bank's customer, absent a special relationship between the bank and the investors.  *Id.* at 423-24, 937 P.2d at 345-46.

-15-

¶24 The *Kesselman* plaintiffs cited several cases in support of their argument that the bank owed them a duty of disclosure. The court found these cases unhelpful to the plaintiffs' argument, pointing out that the "key distinguishing factor in all of the cases [where a duty to disclose was found] . . . is that the banks were *directly involved with the third parties in the transactions that were the subject of litigation*. This involvement satisfied the necessary relationship giving rise to the duty of disclosure." *Id.* at 423, 937 P.2d at 345 (emphasis added). The facts of *Kesselman* disclosed no such relationship. In contrast, the Triparty Agreement, which the Bank insisted upon in the case at bar, provides clear, direct involvement between the Bank and the Funds.

¶25 Moreover, while the court in *Kesselman* expressed no opinion on whether the bank owed a duty to any regulatory agency to report irregularities observed in its customer's account, the court did recognize, albeit in dictum, that fraudulent practices by a customer have "a very damaging effect on innocent persons, and a bank's failure to put an end to the practice contributes to such damage." *Id.* at 424, 937 P.2d at 346.

¶26 Even if the Funds' claims were dependent on a duty to disclose, *Kesselman* itself cited a Minnesota case that more accurately contemplates the facts presented here. *See Richfield Bank & Trust Co. v. Sjogren*, 244 N.W.2d 648 (Minn. 1976). There,

the Minnesota Supreme Court recited the rule that generally a party to a transaction has no duty to disclose material facts to the other party unless a "special circumstance" exists. *Id*. at 650. The court acknowledged that special circumstances are typically those where there is a fiduciary or confidential relationship, or where one party has special knowledge of material facts to which the other party has no access, or where one party has spoken, but has not said enough to prevent his words from being misleading. *Id*.

¶27     The court explained that there were situations beyond those enumerated which would constitute special circumstances giving rise to an obligation to disclose. *Id*. The court held that one of those "special circumstances" arises when a bank has actual knowledge of the fraudulent activities of a customer and that if a bank has actual knowledge of the fraud, it has a concomitant "affirmative duty to disclos[e] those facts" before it engages in transactions with the customer which "further[] the fraud." *Id*. at 652; *see also Barnett Bank of West Florida v. Hooper*, 498 So. 2d 923 (Fla. 1986) (special circumstance requiring disclosure may be found where bank has actual knowledge of fraud being perpetrated).

¶28     Similarly, we have previously held that an escrow agent, notwithstanding the duty of confidentiality, must disclose information when the agent "'knows that a fraud is being committed.'" *Burkons v. Ticor Title Ins. Co.*, 168 Ariz. 345, 353,

-17-

813 P.2d 710, 718 (1991) (quoting *Berry v. McLeod*, 124 Ariz. 346, 352, 604 P.2d 610, 616 (1979).  Although the agent does not have a duty to investigate, she must disclose where she has "substantial evidence" of fraud.  *Burkons* at 355, 813 P.2d at 720.

¶29      In *Lombardo v. Albu*, 199 Ariz. 97, 100, 14 P.3d 288, 291 ¶13 (2000), we held explicitly that a buyer's agent in a real estate transaction must disclose to the seller evidence known to him that is material to buyer's inability to perform.  Here, the Funds allege and have presented evidence that the Bank knew Symington was advancing false and misleading financial information, both to the Bank and to the Funds, regarding his ability to perform the permanent loan obligations.

¶30      Thus, it was error for the lower courts to dismiss all of the Funds' intentional tort claims by citing *Kesselman* and relying on the Bank's alleged lack of duty to make disclosure.

**III. The Funds' Tort Claims**

   **A.   Aiding and Abetting Fraud**

¶31      Arizona recognizes aiding and abetting as embodied in Restatement § 876(b), that a person who aids and abets a tortfeasor is himself liable for the resulting harm to a third person. *Gemstar Ltd. v. Ernst & Young*, 183 Ariz. 148, 159, 901 P.2d 1178, 1189 n.7 (App. 1995), *vacated on other grounds*, 185 Ariz. 493, 917 P.2d 222 (1996); *Gomez v. Hensley*, 145 Ariz. 176, 178, 700 P.2d 874, 876 (App. 1984); *see also* RESTATEMENT (SECOND) OF TORTS § 876(b)

(1977).

¶**32**     The aiding and abetting claim here was not specifically addressed in the court of appeals decision, but summary judgment was affirmed on the basis that the Bank had no duty to disclose under *Kesselman*.

¶**33**     "[A]iding and abetting liability does not require the existence of, nor does it create, a pre-existing duty of care . . . .  Rather, aiding and abetting liability is based on proof of a scienter . . . the defendants must *know* that the conduct they are aiding and abetting is a tort."  *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 186 (Minn. 1999); *Pacific Mut. Life Ins. Co. v. Ernst & Young & Co.*, 10 S.W.3d 798, 804 (Tex. App. 2000) (to the extent that duty may be considered a part of the scienter element of a fraud claim, such duty extends to all persons the fraud defendant intends or has reason to expect will rely on its misrepresentations (citing RESTATEMENT (SECOND) OF TORTS § 531)), *judgment rev'd*, 51 S.W.3d 573 (Tex. 2001).

¶**34**     Claims of aiding and abetting tortious conduct require proof of three elements:

> (1)  the primary tortfeasor must commit a tort that causes injury to the plaintiff;
>
> (2)  the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and
>
> (3)  the defendant must substantially assist or encourage the primary tortfeasor in the achievement

-19-

of the breach.

*Gomez*, 145 Ariz. at 178, 700 P.2d at 876 (citing RESTATEMENT (SECOND) OF TORTS § 876(b)).

¶35     The Funds allege that Symington misrepresented material facts by submitting false financial statements.  Such proof, if introduced by the Funds, will establish primary, tortious conduct by Symington.

¶36     Because aiding and abetting is a theory of secondary liability, the party charged with the tort must have knowledge of the primary violation, and such knowledge may be inferred from the circumstances.  *See In re American Continental Corp./Lincoln Sav. and Loan Sec. Litig.*, 794 F. Supp. 1424, 1436 (D. Ariz. 1992) ("American Continental").  Unquestionably, the Bank was aware of Symington's duty under the Permanent Commitment to provide accurate financial information to the Funds.  The Triparty Agreement references the requirements of the Permanent Commitment in several sections.

¶37     Evidence supporting the inference that the Bank had knowledge of Symington's fraud is contained, among other places, in the financial statements Symington provided to the Bank on May 4 and June 21, 1990.  Those statements contained information the Bank knew was false:  (1) Symington overstated the value on Alta Mesa by $2 million and understated his personal liability on Alta Mesa by $1 million.  The Bank knew Alta Mesa was worth $1 million less as

a result of an appraisal conducted by the Bank in November 1989, which reduced the property's value by one-half;[12] (2) Symington represented $791,000 in "readily marketable securities." The Bank knew these securities were actually in spendthrift trusts and thus inaccessible to creditors; (3) Symington responded "no" to the question on the financial statement: "Are there any suits, judgments, tax deficiencies, or other claims pending *or in prospect* against you?" (Emphasis added). The Alta Mesa loan had been in technical default since March 15, 1990, and the Bank obviously knew it.

¶38 The Funds' banking expert set forth several aspects of Symington's financial statement the Bank knew were false. Jeffery P. Gaia Declaration at ¶ 44.[13] The Bank's knowledge of Symington's

---

[12] O. Jeffrey White [former Wells Fargo employee] admitted the inconsistency between the value of Alta Mesa and the value represented on Symington's financial statement in his August 7, 1998 deposition:

Q. From 61, Exhibit 61, it looks like Mr. Symington has an obligation of about $1 million to the Bank under his guarantee.
A. True.
Q. How does that square with him showing that he has $250,000 of equity?
A. I believe –
MR. CARDENAS: Objection, asked and answered.
A. I believe I answered that. It doesn't.

[13] Gaia's declaration was based upon his experience and expertise as a banker, his personal knowledge of market conditions and banking practices, his review of certain deposition testimony, and his review of documents and records of First Interstate Bank concerning the Alta Mesa and Mercado loans. Gaia has been professionally employed in the banking industry since 1979. His experience involved commercial, corporate, and real estate loans,

false and misleading representations is also reflected in the Bank's own memoranda. On June 7, 1990 (23 days before the take-out), Jeff White's memo to the Bank's Senior Loan Committee requesting authority to charge off the $1.2 million shortfall on the Mercado loan described Symington's then-existing financial condition. A financial statement was provided to the Senior Loan Committee with White's memo. The memo demonstrates the Bank's knowledge:

> Symington's stated net worth is almost entirely vested in commercial real estate, indicated market values of which *he has stated do not accurately reflect the current market*. Contingent debt also appears not to have been fully accounted for on his recent statement. Marketable securities shown on the statement are held in an irrevocable family trust of which Symington is the beneficiary. Trustor is unknown, trustee is Mellon Bank, and Symington claims that the asset cannot be liquidated or pledged.

(Emphasis added). White later testified that he determined that the listed real estate values were inaccurate. Thus, the Bank had knowledge of these matters.

¶39 When White received Symington's May 4, 1990 financial statement, he knew the Funds were also entitled to receive a financial statement under the terms of the Permanent Commitment. The Funds produced evidence affirming that the Bank understood the Funds received the same false financial statements that it did. White testified:

---

including experience with workouts for problem loans. *See* Gaia Declaration at ¶¶ 2, 4, 6, and 7.

-22-

Did you expect that Mr. Symington would have submitted the same numbers reflecting his financial conditions to both First Interstate Bank and to the pension funds?

A:    I would hope so, yes.

This statement raises the inference that the Bank knew that fraud was being committed against the Funds.

¶40    On June 8, 1990, the Senior Loan Committee conditionally approved White's requested $1.2 million write-off in his June 7 memo but asked that he obtain an accurate financial statement from Symington.   The Senior Loan Committee was concerned about the statement, as Ward Wilson, a member of the committee testified:

Q:    Given that Mr. Symington had warranted the values in his financial statement only a month prior to your consideration of it, did it occur to you that the inflated values could have been the result of intentional misstatements by Mr. Symington?

MR. CARDENAS:   Objection   to   characterization with respect to "inflated values."

A.    I believe that we were concerned about that.

¶41    On June 26, 1990, Symington resubmitted his personal financial statement dated June 21, 1990, to the Bank.   This statement also failed to provide current market values or disclose contingent debt.   Regarding the securities listed on the financial statement, Symington produced a letter from the trustee of a trust of which he was the beneficiary, disclosing that the "readily marketable securities" listed on his financial statement at a value of $791,000 were, in fact, not readily marketable but were held in

trust subject to a spendthrift provision.[14]  The June 21 financial statement also included one other change.  Symington unilaterally changed the certification language on the statement from the Bank's standard language that the statement was accurate to a statement that the figures were merely Symington's "best efforts" to arrive at accurate figures.

¶42     The Senior Loan Committee found the updated financial statement just as disconcerting.  Ward Wilson testified:

> Q.   Okay.  Upon getting that information, did you feel as though Mr. Symington had provided accurate and honest information about the current state of his financial condition to First Interstate?
>
> MR. CARDENAS:  Objection; calls for speculation.
>
> A.   Our concern about that was heightened.

¶43     Evidence that the Bank knew Symington had misled the Funds can also be seen in a letter dated June 25 from Jeff White to the Senior Loan Committee at the Bank, updating the Committee on the status of the Mercado loan.   White's letter discusses "perceived impediments" to the funding of the Permanent Commitment. White listed the Mercado limited partners as potential impediments.

---

[14] White testified that information regarding the spendthrift trust did not make the financial statements deceptive and did not alarm the Bank because it already knew the securities were in a spendthrift trust, and had known this since at least 1986.  White admitted, however, that nothing on the face of the financial statement would indicate that the securities were subject to spendthrift restrictions and that as such, they were not, as represented, "readily marketable."

The limited partners were upset because mathematical errors relating to the partners' return on investment calculations were found after the formation of the partnership. The limited partners were threatening to exercise their rescission rights and demand refund of their initial $500,000 investment. Regarding this situation, White states, "[t]his threat currently prevents Mercado's counsel from issuing [the Funds] . . . a 'clean' opinion letter, *a condition precedent to closing*." (Emphasis added). White goes on to explain to the Senior Loan committee

> [i]f the limiteds are not satisfied with our subordination language as proposed, they pose a real threat to the permanent loan closing. Our paying off the limiteds, as Symington had earlier proposed, is not deemed a viable option as it would have the effect of dissolving the existing borrowing entity, giving the Permanent Lender [the Funds] a clear out.

¶44    In addition to the threat by the limited partners, White also described the risk to funding stemming from improvements undertaken on the Mercado project to prepare it for tenancy by Arizona State University ("ASU"), which intended to occupy the space as a downtown campus. White informed the Senior Loan Committee "Mercado has requested that FIAZ [the Bank] provide bridge financing for the ASU build-out in an attempt to both keep the subs working, and *to avoid having to disclose the situation to the Permanent Lender at closing*." (Emphasis added). This statement is in reference to $600,000 worth of tenant improvements completed for the ASU space in the Mercado. Despite nearly half of

the improvements being completed, the Mercado Partnership had not made any progress payments to the contractors. The Bank was concerned that the Partnership's lack of progress payments may have violated ¶ 29 of the Permanent Commitment by failing to pay debts as they became due.

¶45     This accumulation of evidence raises the inference that the Bank knew Symington was engaged in false representations to the Funds. Accordingly, a jury could find that the Bank's actions and internal communications provide evidence of a resolute strategy to avoid having the Funds learn what it knew about Symington's financial situation. A showing of actual and complete knowledge of the tort is not uniformly necessary to hold a secondary tortfeasor liable under an aiding and abetting theory. *FDIC v. First Interstate Bank of Des Moines, N.A.*, 885 F.2d 423 (8th Cir. 1989) (bank can be held liable for aiding and abetting a customer who defrauded another bank if bank has a "general awareness" of the customer's fraudulent scheme, notwithstanding the fact that the bank may not have had actual knowledge of the scheme or an intent to participate in the fraud; general awareness of the fraudulent scheme can be established though circumstantial evidence). "The knowledge requirement" can be met, "even though the bank may not have known of all the details of the primary fraud –- the misrepresentations, omissions, and other fraudulent practices." *Aetna Cas. and Sur. Co. v. Leahey Const. Co., Inc.*, 219 F.3d 519,

536 (6th Cir. 2000) ("Leahey") (citing *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1012 (11th Cir. 1985) ("Woods") (internal citations omitted)).

¶**46**      The third requirement, substantial assistance by an aider and abettor, can take many forms, but means more than "a little aid." *In re American Continental*, 794 F. Supp. at 1435 (quoting *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 496 (7th Cir. 1986); *see also CPC Int'l Inc. v. McKesson Corp.*, 514 N.E.2d 116 (N.Y. 1987) (broker aided and abetted primary fraud by providing false financial information used to present "enhanced financial picture to others")).  The legal elements of aiding and abetting a tortfeasor have been explored most comprehensively by the federal courts in the context of aiding and abetting securities fraud.  *See Schatz v. Rosenberg*, 943 F.2d 485 (4th Cir. 1991); *Roberts v. Peat, Marwick, Mitchell & Co.*, 857 F.2d 646 (9th Cir. 1988); *Metge v. Baehler*, 762 F.2d 621 (8th Cir. 1985); *Monsen v. Consolidated Dressed Beef Co., Inc.*, 579 F.2d 793 (3d Cir. 1978). *But cf. Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994) (aiding and abetting liability abolished under § 10(b) of the Securities and Exchange Act of 1934, but secondary actors not completely absolved from liability).

¶**47**      For example, in *Metge*, the court stated that "[a]lthough the facts . . . are unremarkable taken in isolation, we find that taken together, they present what should have been a jury issue on

the question of aiding-and-abetting liability." 762 F.2d at 630. *Metge* involved a suit by investors against a lender for aiding and abetting an issuer of securities who ultimately filed for bankruptcy. The investors alleged that the lender engaged in a series of banking strategies to keep a failing securities issuer in business. In evaluating the record, the court sought to determine whether the lender knew that the thrift certificates being issued were worthless and that because of the lender's involvement, the financial life of the issuer was prolonged in the lender's own interest and at the expense of the certificate holders. The court noted that, viewed separately, most of the banking transactions were unremarkable events, but viewed in conjunction with other evidence, they suggest an unusual pattern of extraordinary attempts to prolong the issuer's financial viability to the detriment of the investors.[15] *Id*. at 626; *see also K & S Partnership v. Continental Bank, N.A.*, 952 F.2d 971, 979 (8th Cir. 1991).

¶48    Other courts have commented that executing transactions, even ordinary course transactions, can constitute substantial

---

[15] The court remarked on the favorable relationship between the lender and the issuer even at a time when the lender knew of the issuer's precarious financial position. The court noted that the evidence suggested that the lender had knowledge of the issuer's thrift certificate program and its importance to the issuer's ability to repay loans to the lender. Finally, the court noted the inference created by the fact that by postponing the issuer's demise, the lender may have been able to leverage itself into a more favorable position with the issuer than the investors when the issuer was prioritizing which debts to pay first. *Metge v. Baehler,* 762 F.2d 621, 630 (8th Cir. 1985).

assistance under some circumstances, such as where there is an extraordinary economic motivation to aid in the fraud. *See Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983) (broker's processing of transactions with knowledge of fraudulent nature was done to generate commissions); *IIT, an Int'l Inv. Trust v. Cornfeld*, 619 F.2d 909, 921-22 (2d Cir. 1980) (defendant performed challenged transaction knowing it violated client's policy, with heightened economic motive to do so).

¶49     There is no doubt that the Bank here had a heightened economic motive to assist Symington.  Not only did the Bank have the typical motivations of a construction lender, *i.e.*, to ensure nothing happens to jeopardize permanent funding, but in this case, the Bank had added incentive to ensure the permanent financing by virtue of its knowledge of Symington's much weakened financial condition.  The Bank knew that Symington was the personal guarantor on the Mercado loan in the event the Funds found reason not to advance permanent funding.  The Bank also knew Symington's personal guarantee was becoming less and less valuable in part because the Bank knew Symington was unable to fulfill his financial obligations on the Alta Mesa loan.

¶50     In addition, Jeff White's June 7, 1990 letter to the Senior Loan Committee evidences the Bank's knowledge of Symington's inability to provide collateral of a value sufficient to cover the $1.2 million shortfall occasioned by the Funds' decision to hold

back part of the $10 million take-out for improvements to the Mercado. These circumstances heightened the Bank's motive to aid and abet in a fraud designed to secure the permanent loan.

¶51        Accordingly, the Funds presented evidence of business strategies undertaken by the Bank to prolong Symington's financial life, raising reasonable inferences that it knew of, and gave substantial assistance to, Symington's material misstatements. Moreover, "if [a] . . . method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability." *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975); *see also Woods* at 1012 (for purposes of establishing liability as an aider and abettor, knowing assistance of a securities violation can be inferred from atypical business actions).

¶52        Here, as noted, the Funds' banking expert offered evidence that the Bank's forbearance from enforcement of the Alta Mesa loan was contrary to prudent banking practices for purposes of securing the Mercado take-out. Gaia Declaration at ¶¶ 37, 39, 40, 43. In addition, the Bank's own employee testified that a forbearance not accompanied by a credit authorization request is unusual if, as here, it extends the maturity of the loan. The Alta Mesa forbearance was not accompanied by a credit authorization request.

¶53        The Bank argues that the single act the Funds complain

about is the forbearance on the Alta Mesa loan. Indeed, the Funds do complain about the forbearance and argue that the Bank's decision to extend rather than foreclose the loan provided "substantial assistance" to Symington by enabling him to claim falsely that he met the requirements of the Permanent Commitment. But it is not solely the forbearance that creates the problem; it is also the Bank's failure to report Symington's false representations to federal banking officials as required by law, where it was admittedly knowledgeable of the false financial statement. *See* 31 C.F.R. § 103.18 (2001).

¶**54** Moreover, substantial assistance does not mean assistance that is necessary to commit the fraud. *Leahey* at 537. The test is whether the assistance makes it "easier" for the violation to occur, not whether the assistance was necessary. *Id*. (quoting *Camp v. Dema*, 948 F.2d 455, 462 (8th Cir. 1991) (internal quotations omitted)).

¶**55** Finally, the Funds' claim of aiding and abetting is further supported by allegations that the Bank, with full knowledge that Symington's financial statements were false, convened the June 8, 1990 meeting and communicated directly with the Funds regarding the Permanent Commitment due on June 30. The Funds were represented in the meeting by legal counsel, Sam Coppersmith. Specifically, it appears the Bank called the meeting with Coppersmith and Symington representatives because the Funds had

announced their intention to reduce the amount of the permanent loan by $1.2 million in order to compensate for Mercado tenant improvements which apparently had been funded by the Bank but were not a part of the basic construction costs. The Bank desired to secure the full $10 million take-out, including the $1.2 million, by exploring, with the Funds, ways to eliminate or otherwise deal with the shortfall or "gap financing" as it was described. If successful, the Bank would receive full reimbursement of the $10 million. The meeting would thus have had no purpose without the presence of the Funds.

¶56 At that time, the Bank knew that Symington was in default on Alta Mesa. Internal documents regarding the Mercado loan referenced Alta Mesa as a "related" debt. The Bank also knew that Symington had submitted false financial statements relative to Mercado, and that just days earlier the Bank had signed a forbearance agreement with Symington on Alta Mesa to keep him financially viable until the day after the permanent loan was due to be funded. Nevertheless, the Bank, with a clear opportunity to speak, kept this information from Coppersmith and pressed for closing the permanent loan at the full $10 million or for an alternate method of handling the "gap" problem.

¶57 Convening the meeting to discuss the loan and potential shortfall in these circumstances, without disclosure of the facts, would justify a reasonable inference that the Bank aided and

abetted by knowingly assisting Symington's tortious conduct. If true, this goes well beyond mere self protection in the midst of a financial transaction gone sour. In sum, it can be inferred that had the Funds been made aware of what the Bank knew, the Funds might well have chosen to withdraw from the obligation under the Permanent Commitment, and the Bank was fully knowledgeable of that prospect.

¶58      These facts raise inferences sufficient to take the issue to the jury under the applicable preponderance standard.[16]

B.      **Breach of the Implied Covenant of Good Faith and Fair Dealing**

¶59      Arizona law implies a covenant of good faith and fair dealing in every contract. *Enyart v. Transamerica Ins. Co.*, 195

---

[16] Aiding and abetting fraud requires proof by a preponderance of the evidence. *York v. InTrust Bank, N.A.*, 962 P.2d 405, 422 (Kan. 1998) (because jury ruled in favor of defendant on fraud count which required higher burden of proof does not mean evidence was insufficient to prove aiding and abetting fraud); *State ex rel. Goettsch v. Diacide Distributors, Inc.*, 561 N.W.2d 369 (Iowa 1997) (preponderance of the evidence is the proper standard of proof for aiding and abetting securities fraud under Iowa law); *State, Dep't of Finance v. Tenney*, 858 P.2d 782 (Idaho App. 1993) (aiding and abetting securities violation must be proven by preponderance of the evidence under Idaho law).

Because there is a difference between proving an agreement to participate in a tortious line of conduct (civil conspiracy) and proving knowing action that substantially aids tortious conduct (aiding and abetting), *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983), we deem the preponderance standard more appropriate for an aiding and abetting claim.

-33-

Ariz. 71, 985 P.2d 556, ¶14 (1998) (citing *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565 (1986)); *see also Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 383, 710 P.2d 1025, 1038 (1985)). Such implied terms are as much a part of a contract as are the express terms. *Golder v. Crain*, 7 Ariz. App. 207, 437 P.2d 959 (1968). The implied covenant of good faith and fair dealing prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement. The duty arises by operation of law but exists by virtue of a contractual relationship. *Rawlings* at 153-54, 726 P.2d at 569-70.

¶60 Breach of the implied covenant may provide the basis for imposing damages. *Burkons* at 355, 813 P.2d at 720. A party may bring an action in tort claiming damages for breach of the implied covenant of good faith, but only where there is a "special relationship between the parties arising from elements of public interest, adhesion, and fiduciary responsibility." *Id.* at 355, 813 P.2d at 720; *see also Wagenseller* at 383, 710 P.2d at 1038; *McAlister v. Citibank (Arizona), a Subsidiary of Citicorp*, 171 Ariz. 207, 829 P.2d 1253 (App. 1992) (a special relationship must exist in order to support a *tortious* breach of the implied covenant of good faith and fair dealing). The Funds have conceded that they do not have the required "special relationship" to support a claim for tortious breach.

¶61 There is a difference, however, in the proof required,

depending on whether the claim sounds in tort or in contract. Here, the remedy for breach of the implied covenant is an action for breach claiming *contract* damages. *Burkons* at 355, 813 P.2d at 720. When the remedy for breach of the covenant sounds in contract, it is not necessary for the complaining party to establish a special relationship. *Firstar Metro. Bank & Trust v. Federal Deposit Ins. Corp.*, 964 F. Supp. 1353, 1358 (D. Ariz. 1997) ("[I]n light of the distinction between tortious and contractual claims based on the breach of the implied covenant of good faith and fair dealing, Plaintiff's assumption that it need not demonstrate a special relationship is correct."). The claim presented in the Funds' counterclaim alleges breach of contract, a claim that is thus viable without the special relationship required for tortious relief.

¶62     The Bank, relying on *Kesselman* at 421, 937 P.2d at 343, argues that in the absence of duty, it did not act in bad faith by failing to disclose Symington's true financial condition to the Funds. The lower courts agreed. But, as noted, *Kesselman* does not dispose of this claim. *Deese v. State Farm Mut. Auto. Ins. Co.*, 172 Ariz. 504, 507, 838 P.2d 1265, 1268 (1992) (bad faith is not proven by showing negligence; the act or omission must be intended). Moreover, unlike the bank in *Kesselman*, the Bank here was directly and contractually involved in the transaction with the Funds via the Triparty Agreement, an agreement which the Bank

itself insisted be executed.

¶63    The Triparty Agreement is the lynchpin of the Funds' claim of bad faith.  The "underlying contract provides the basis for a bad faith action." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 174, 176, 913 P.2d 1092, 1094 (1996) *(citing Noble v. National American Life Ins. Co.*, 128 Ariz. 188, 189, 624 P.2d 866, 867 (1981)).  Because the terms of the Triparty Agreement do not require the Bank to volunteer information to the Funds, the Bank argues that it cannot be liable for bad faith because it did not breach any provisions of the Triparty Agreement.  The Bank relies too heavily on the literal text.  The duty of good faith extends beyond the written words of the contract.

¶64    A party may breach an express covenant of the contract without breaching the implied covenant of good faith and fair dealing.  *Rawlings* at 157-60, 726 P.2d at 573-76.  Conversely, because a party may be injured when the other party to a contract manipulates bargaining power to its own advantage, a party may nevertheless breach its duty of good faith without actually breaching an express covenant in the contract.  *Deese* at 509, 838 P.2d at 1270 (noting that a breach of an express covenant is not "a necessary prerequisite" for a bad faith claim); *Rawlings* at 157-60, 726 P.2d at 573-76.

¶65    For example, in *Arizona's Towing Professionals Inc. v. State*, the court of appeals held that a party to a contract could

not use an express provision in the contract -- in that case, a "cancellation for convenience" provision -- to thwart administrative or judicial review of the state's decisions in awarding contracts after the bidding process. 196 Ariz. 73, 77, 993 P.2d 1037, 1041 (App. 1999). The court found that if cancellations for convenience were permissible under these circumstances, they would effectively eliminate a party's appeal rights, which would violate the implied covenant of good faith, even though the state expressly retained the power to cancel. *Id.* at 77, 993 P.2d at 1041. Similarly, *Southwest Savings & Loan Association v. Sunamp Systems, Inc.* addressed whether one who retains express power or discretion under a contract can exercise that power or discretion in a way that breaches the implied covenant of good faith. 172 Ariz. 553, 558, 838 P.2d 1314, 1319 (App. 1992). In answering this question, the *Sunamp* court favorably cited a California decision, stating that "the duty to act in good faith does not alter the specific obligations of the parties under the contract. . . . Acts in accord with the terms of one's contract cannot *without more* be equated with bad faith." *Id.* at 558, 838 P.2d at 1319 (quoting *Balfour, Guthrie & Co. v. Gourmet Farms*, 166 Cal. Rptr. 422, 427-28 (App. 1980) (emphasis in original)).

¶66      *Southwest Savings* explained that

> [m]uch of the mystery of the law of good faith lies in

the *Balfour* phrase "without more."  If contracting par-
ties cannot profitably use their contractual powers
without fear that a jury will second-guess them under a
vague standard of good faith, the law will impair the
predictability that an orderly commerce requires.

*Id.* at 558, 838 P.2d at 1319.  Yet, "[i]nstances inevitably arise

where one party exercises discretion retained or unforeclosed under

a contract in such a way as to deny the other a reasonably expected

benefit of the bargain." *Id.*  The court concluded that the implied

covenant of good faith provides a clear remedy for such abuse.  In

reaching its conclusion, the court relied on Professor Steven J.

Burton's explanation of the duty of good faith:

> The good faith performance doctrine may be said to permit
> the exercise of discretion for any purpose -- including
> ordinary business purposes -- reasonably within the
> contemplation of the parties.  A contract thus would be
> breached by a failure to perform in good faith if a party
> uses its discretion for a reason outside the contemplated
> range -- a reason beyond the risks assumed by the party
> claiming a breach.

*Id.* at 558-59, 838 P.2d 1319-20 (quoting *Breach of Contract and the*

*Common Law Duty to Perform in Good Faith*, 94 HARV. L. REV. 369, 385-

86 (1980) ("Burton") (footnotes omitted)).  Burton's recitation

fully comports with RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a

(1981), which states, "Good faith performance or enforcement of a

contract emphasizes faithfulness to an agreed common purpose and

consistency with the justified expectations of the other party."

Consistent with Burton and the RESTATEMENT, this court has held in a

variety of contexts that a contracting party may not exercise a

retained contractual power in bad faith.  *See Rawlings* at 153-157,

726 P.2d at 569-73 (power to adjust claims in an insurance contract); *Wagenseller* at 385-86, 710 P.2d at 1040-41 (power to fire employee at will for a bad cause).

¶67    In the instant case, under the Triparty Agreement the Bank had no express duty to comply with Symington's disclosure obligations under the Permanent Commitment. But, the inquiry for the Funds' claim of bad faith does not end with mere recognition that the written text of the Triparty Agreement may have freed the Bank from any obligation to inform the Funds of Symington's financial condition. The question is whether a jury might reasonably find that the Bank wrongfully exercised a contractual power for "a reason beyond the risks" that the Funds assumed in the Triparty Agreement, or for a reason inconsistent with the Funds' justified expectations. *Burton* at 386; *Southwest Sav.* at 559, 838 P.2d at 1320; RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a.

¶68    The Funds contend that, although the Bank was not obligated to inform the Funds of the collapse of Symington's finances, the Bank proceeded in bad faith by knowing that the Funds would be deprived of knowledge of Symington's true condition in reaching the decision to accept or reject the Mercado loan.[17]

---

[17] Triparty Agreement § 3.9: . . . Permanent Lender will fund the Permanent Loan on or before such date . . . (ii) if Borrower has complied with each and every condition of the Permanent Commitment to the reasonable satisfaction of Permanent Lender, and (iii) if all submittals and documentation required by Permanent Lender in order to fund the Permanent Loan have been received in the Permanent Lender's office . . . .

Symington deprived the Funds of this information. There is evidence the Bank knew of the deprivation and engaged in a systematic strategy designed to withhold material information from the Funds and to keep Symington financially alive until after the take-out deadline, all of which resulted in serious and clearly anticipated damage to the Funds.

¶69    The key questions are:

(1) were the Bank's actions inconsistent with what the Funds justifiably expected under the Triparty Agreement?

(2) did the Bank, by its action or inaction, deprive the Funds of a primary benefit of the agreement *(see* RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a. ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."))?

(3) was it reasonable for the Funds to assume the Bank would follow federal banking regulations and report non-compliant activity (*see* 31 C.F.R. § 103.18 (bank shall file with the Treasury Department a report of any suspicious transaction relevant to a possible violation of law or regulation))? and

(4) was it reasonable for the Funds to assume, despite the Bank's self interest, that the Bank would disclose its alleged knowledge of Symington's false financial statements?

¶70    The foregoing are genuine questions of material fact. The inferences favorable to the Funds' claim are sufficient for a jury's consideration under the preponderance standard.[18]

---

[18] Proof of a breach of the implied covenant of good faith and fair dealing requires a preponderance of the evidence. *See Schwartz v. Farmers Ins. Co. of Ariz.*, 166 Ariz. 33, 36, 800 P.2d 20, 23 (App. 1990) (plaintiffs must prove breach of duty of good faith and fair dealing by a preponderance of the evidence); *see*

### C. Intentional Interference With Contractual Relations

**¶71** The Funds claim that by obscuring or concealing Symington's collapsing finances, the Bank improperly interfered with the Funds' contract right to receive full, accurate information as a basis on which to reject the Permanent Commitment on the Mercado loan.

**¶72** The interference with contract claim was not separately addressed by the court of appeals but was swept into the court's general reasoning that the bank had no duty to disclose Symington's financial status to the Funds.

**¶73** Intentional interference with contract is, as its name suggests, an intentional tort. *Snow v. Western Sav. & Loan Ass'n*, 152 Ariz. 27, 34, 730 P.2d 204, 211 (1986); *see also* RESTATEMENT (SECOND) OF TORTS § 767 cmt. d (1979) (interference with contractual relations is an intentional tort). In addition, "*[t]he duty not to interfere with the contract of another arises out of law, not contract.*" *Bar J Bar Cattle Co. Inc. v. Pace*, 158 Ariz. 481, 486, 763 P.2d 545, 550 (App. 1988) (emphasis added). We therefore examine the merits of the Funds' claim.

**¶74** Arizona has long recognized the tort of intentional

---

*also General Acc. Fire & Life Assur. Corp. v. Little*, 103 Ariz. 435, 443-44, 443 P.2d 690, 698-99 (1968) (lower court did not err in refusing to give instruction on clear and convincing burden of proof for "bad faith" claim; the proper standard was the preponderance of the evidence).

interference with contractual relations. *See Snow* at 33, 730 P.2d at 211. A prima facie case of intentional interference requires: (1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly. *Id.;* RESTATEMENT (SECOND) OF TORTS § 766 (1977).

¶75     The first element, the existence of a valid contractual relationship, is satisfied by the Permanent Commitment between Symington and the Funds.[19]

¶76     Second, as party to the Triparty Agreement and beneficiary of the proceeds under the Permanent Commitment, the Bank had knowledge of the terms of both contracts. The terms of the Permanent Commitment are frequently referenced in the Triparty Agreement, and the Bank insisted Symington secure long-term financing through the Permanent Commitment before it would agree to fund the interim construction loan.

---

[19] The Funds assert in their brief that the Bank interfered with both the Permanent Commitment and the Triparty Agreement. As a general rule, a party cannot be held liable in tort for intentional interference with its own contract. *Campbell v. Westdahl*, 148 Ariz. 432, 438, 715 P.2d 288, 294 (App. 1985). This general rule is complicated here by the fact that the Bank, the Funds, and Symington were parties to a tripartite agreement. We do not address the question whether a party to a tripartite contract can be liable in tort for interfering with rights as between the other parties to the agreement because the Funds can satisfy this element of the tort by the Permanent Commitment.

¶77    Third, intent is shown by proving that the interferor either intended or knew that "[a particular] result was substantially certain to be produced by its conduct." *Snow* at 34, 730 P.2d at 211.

¶78    "There is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract." RESTATEMENT (SECOND) OF TORTS § 766 cmt. k (1979).  In most instances the interference is by inducement.  As the RESTATEMENT explains, the word "inducing" refers to situations in which A causes B to choose one course of conduct rather than another.  "Whether A causes the choice by persuasion or by intimidation, B is free to choose the other course if he is willing to suffer the consequences." *Id.,* § 766 cmt. h.  While the paradigm case of tortious interference with contract may be that of a tortfeasor who induces breach by enticing the contracting party not to perform or by preventing or disabling that party from being able to perform, the RESTATEMENT emphasizes that liability attaches to *any* intentional interference, whether by inducement *or otherwise*.  *Id*. (emphasis added).  "The essential thing is the intent to cause the result." *Id*.

¶79    Here, Symington breached his contractual obligation to

the Funds by submitting false financial statements.[20]  Whether the Bank intended that its conduct operate to disadvantage the Funds in order to obtain payment of the Mercado loan under the Permanent Commitment necessarily requires a jury assessment of the Bank's intent.  Strategies in which the Bank readily participated, such as the Alta Mesa loan extensions, the forbearance, and the failure to report, raise legitimate inferences relating to the Bank's intent.  Intent is a question for the fact finder.  *Snow* at 34, 730 P.2d at 211.  The Bank certainly had reason to believe that false financial information was going to the Funds, giving rise to the inference that, by its strategy, the Bank intended to benefit by this conduct at the expense of the Funds.

¶80      Fourth, the Funds can prove resultant damage if they can establish that the Mercado loan would not have been funded had they been given accurate information.

¶81      Fifth, wrongful conduct can be analyzed by considering seven factors previously advanced by this court:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in pro-tecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or

---

[20] Whether Symington would have breached his contractual obligations to the Funds without substantial involvement by the Bank is a question of causation, not intent.  Causation is also a question for the jury.  *Molever v. Roush*, 152 Ariz. 367, 374, 732 P.2d 1105, 1112 (App. 1986) (citing *Harmon v. Szrama*, 102 Ariz. 343, 429 P.2d 662 (1967)).

remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Wagenseller* at 387, 710 P.2d at 1042 (quoting RESTATEMENT (SECOND) OF TORTS § 767); *see also Bar J Cattle Co.* at 484, 763 P.2d at 548. Factors deserving the most weight are the nature of the actor's conduct and the actor's motive. *G.M. Ambulance & Med. Supply Co., Inc. v. Canyon State Ambulance, Inc.*, 153 Ariz. 549, 551, 739 P.2d 203, 205 (App. 1987).

¶82 Conduct specifically in violation of statutory provisions or contrary to public policy may for that reason make an interference improper. RESTATEMENT (SECOND) OF TORTS § 767 cmt. c (1979). The testimony from banking expert Gaia regarding the Bank's handling of the Alta Mesa loan is relevant here. Based on his review of the Alta Mesa loan history, Gaia opined that the agreement to forbear on the Alta Mesa loan default was inconsistent with prudent and reasonable banking practices and inconsistent with the course of action previously prescribed by the loan's Special Credits Officer, Doug Hawes. *See* Gaia Declaration at ¶¶ 37, 39, 40, 43.

¶83 As further relevant evidence, the Funds offered to prove the Bank's failure to report Symington's false financial statements to the Financial Crimes Enforcement Network of the Department of Treasury, as mandated by federal banking regulations. *See* 31 C.F.R. § 103.18 (2001). The regulations require FDIC insured banks

to file a "Suspicious Activity Report" when they detect a known or suspected criminal violation of federal law or a suspicious transaction, such as filing a false financial statement. *Id.* White, the Bank's own loan officer, testified in deposition that he knew intentional fraudulent submissions of financial statements would trigger reporting requirements to the FBI. Nevertheless, the Bank did not report. It claims its conduct was not improper because it did not know Symington's financial statements were false. But inferences of the Bank's knowledge of false statements are clearly present.

¶84 The Bank responds with several additional arguments. First, it argues that, even despite the inconsistencies in the financial statement, no one at the Bank believed that an event had occurred under ¶ 29 of the Permanent Commitment regarding Symington's financial status that would have given the Funds the legal right to refuse to honor the Triparty Agreement. The Bank contends that the provisions under ¶ 29, which include "generally not paying Debtor's debts as such debts become due" and "assignment for the benefit of creditors," are terms of art from sections of the U.S. Bankruptcy Code or its state statutory equivalent. *See* 11 U.S.C.A. § 303(h)(1) (1993); A.R.S. §§ 44-1031 to -1047 (1994 and Supp. 2001). Because an event which would qualify under the relevant bankruptcy statutes had not occurred, the Bank contends nothing happened that would allow the Funds not to comply with the

Permanent Commitment. This argument is tenuous in light of the fact that, in other sections of ¶ 29, when the parties intended to refer to a section of the Bankruptcy Code, it was expressly stated. Moreover, the Bank knew that despite its loan extensions to Symington and the Forbearance Agreement, the Alta Mesa loan was absolutely in default and amounted to clear failure to pay a debt when due.

¶85    The Bank further argues that under the Triparty Agreement it was not required to disclose information not requested. The Bank claims that, under *Kesselman*, it actually has a duty *not* to disclose confidential customer information. *See Kesselman* at 421, 937 P.2d at 343. If simple nondisclosure were the essence of this case, the Bank could not be liable, based on the holding in *Mac Enterprises v. Del E. Webb Development Co.*, 132 Ariz. 331, 336, 645 P.2d 1245, 1250 (App. 1982). But, as discussed, simple nondisclosure is not the claim the Funds make. The real questions are the propriety of the Bank's affirmative decision not to institute foreclosure proceedings against Alta Mesa, the forbearance, the failure to report Symington's false statements to federal authorities, and whether these intentional actions or omissions interfered with the Funds' right to receive from Symington information material to their decision to fund the Mercado loan.

¶86    Finally, the Bank argues that even if it knew the

statements were false, it was acting properly in its own self-interest by not disclosing Symington's financial status to the Fund to protect itself against a $10 million loss. We agree that the Bank may have been acting in its self-interest and we are cognizant of the inherent conflict between the parties' interests created by the interim loan and Permanent Commitment. But self-interest does not justify an affirmative strategy to deprive the Funds of information which the Bank knows is vital to the Funds' legitimate expectations under the Permanent Commitment. Further, it is not justification to interfere knowingly with a contract where the defendant acts with an improper purpose and seeks to further his own interests. *Community Title Co. v. Roosevelt Fed. Sav. and Loan Ass'n*, 796 S.W.2d 369 (Mo. 1990). Summary judgment on the Funds' tortious interference with contract claim was improper. Inferences arising from the evidence are sufficient to go to the jury under the preponderance standard.[21]

### D. Fraudulent Concealment

---

[21] Intentional interference with contract requires the preponderance standard. *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 761 A.2d 1268, 1273-75 (Conn. 2000) (Com-Tronics must prove claim of tortious interference with contractual relations by a preponderance of the evidence); *Examination Mgmt. Serv., Inc. v. Kirschbaum*, 927 P.2d 686, 697 (Wyo. 1996) (in claim for intentional interference with contract, defendant has burden of proving elements by a preponderance of the evidence); *see also Collins v. Collins*, 625 So. 2d 786, 791 (Miss. 1993) (elements of tortious interference need to be proven only by a preponderance of the evidence).

¶87    Arizona recognizes the tort of fraudulent concealment:

> One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering.

RESTATEMENT (SECOND) OF TORTS § 550 (1976); *see also King v. O'Rielly Motor Co.*, 16 Ariz. App. 518, 521, 494 P.2d 718, 721 (1972).  Where failure to disclose a material fact is calculated to induce a false belief, "the distinction between concealment and affirmative misrepresentation is tenuous."  *Schock v. Jacka*, 105 Ariz. 131, 133, 460 P.2d 185, 187 (1969).

¶88    The court of appeals dismissed the Funds' claim for fraudulent concealment on the basis that the Bank's fiduciary and contractual duty was to Symington and not to the Funds.  Both the court of appeals and the Bank mistakenly cite *Frazier v. Southwest Savings & Loan Association*, 134 Ariz. 12, 653 P.2d 362 (App. 1982), for the proposition that concealment was not proven because there was no duty to speak.[22]

---

[22] The confusion surrounding the requisites of fraudulent concealment results from the fact that there are three distinct classes of fraud: misrepresentation, concealment, and non-disclosure.  Liability for fraudulent misrepresentation occurs under § 525 of the RESTATEMENT (SECOND) OF TORTS and lies against "[o]ne who fraudulently makes a misrepresentation of fact . . . for the purpose of inducing another to act or to refrain from action . . . ."  In contrast, liability for nondisclosure occurs under § 551 of the RESTATEMENT (SECOND) OF TORTS and lies against "[o]ne who fails to disclose to another a fact . . . if, but only if, he is under a duty to the other . . . to disclose the matter in question."  Liability for fraudulent concealment occurs under § 550

¶89       In *Frazier*, the court explained that liability for concealment under § 550 of the RESTATEMENT (SECOND) OF TORTS requires knowledge of the false information and action by the defendant that intentionally prevented the plaintiff from finding the truth. 134 Ariz. at 17, 653 P.2d at 367. The *Frazier* court found concealment unproven, not because there was no duty to disclose, but because there was no evidence from which the jury could have found active concealment.[23] *Frazier* at 17, 653 P.2d at 367.

¶90       The court of appeals has previously referred to a duty requirement in the context of fraudulent concealment. *Dunlap v. City of Phoenix*, 169 Ariz. 63, 69, 817 P.2d 8, 14 (App. 1990). In *Dunlap*, the court stated that "[t]o be guilty of fraudulent concealment, a defendant must have a legal or equitable obligation to reveal the information." *Dunlap* at 69, 817 P.2d at 14. This statement was dictum however, since the case was decided on statute

---

of the RESTATEMENT (SECOND) OF TORTS and lies against a "party to a transaction who by *concealment or other action intentionally* prevents the other from acquiring material information." (Emphasis added.) As discussed, duty has no relevance in a tort requiring an intentional act. Concealment necessarily involves an element of non-disclosure, but it is the intentional act of preventing another from learning a material fact that is significant, and this act is always the equivalent of a misrepresentation. RESTATEMENT (SECOND) OF CONTRACTS § 160 ("Action intended or known to be likely to prevent another from learning a fact is equivalent to an assertion that the fact does not exist.").

[23] The opinion does address the concept of duty; however, the discussion occurred in the context of Frazier's claims under RESTATEMENT (SECOND) OF TORTS § 551, "Liability for Nondisclosure" and RESTATEMENT (SECOND) OF TORTS § 552, "Information Negligently Supplied for the Guidance of Others."

of limitations grounds. *Id.* at 70, 817 P.2d at 15. Moreover, the two cases *Dunlap* relied on for this proposition, *Schock v. Jacka* and *Van Buren v. Pima Community College District Board*, 113 Ariz. 85, 546 P.2d 821 (1976), did not hold fraudulent concealment is subject to a disclosure duty.

¶91 In *Schock*, neither the complaint nor the plaintiff's opposition to summary judgment articulated any theory of fraudulent concealment. 105 Ariz. at 133, 460 P.2d at 187. In *Van Buren*, the plaintiff raised both fraudulent and negligent failure to disclose. The court found no fraudulent failure because there was no proof the statements were false, nor was there proof the defendant knew of any falsehood. *Van Buren* at 86, 546 P.2d at 822. The court correctly dismissed *negligent* failure because it found no duty. *Id.* at 87, 546 P.2d at 823.

¶92 In Arizona, whether a duty to speak exists at all is determined by reference to all the circumstances of the case. *National Hous. Indus., Inc., v. E.L. Jones Dev. Co.*, 118 Ariz. 374, 379, 576 P.2d 1374, 1379 (App. 1978) (citing 37 AM. JUR. 2d, *Fraud & Deceit* § 146 (1968)). On the issue of duty in a fraudulent concealment claim, we are persuaded by and affirm the reasoning articulated by the court of appeals decision in *King v. O'Rielly Motor Co.*

¶93 In *King*, a car buyer sued a car dealer for fraudulently representing that the car the buyer purchased was "as good as new"

when in fact the car had been in an accident and, unbeknownst to the buyer, had been repaired by the dealer. The car dealer argued that because the buyer's claim existed under § 551 of the RESTATEMENT OF TORTS (Liability for Nondisclosure), the dealer could not be liable to the buyer because the dealer was under no duty to disclose. The court refused to limit its consideration of the plaintiff's claim to § 551, stating "[w]ith these facts in mind we feel that a consideration of §§ 529 and 550 of RESTATEMENT OF TORTS . . . is necessary for the determination of the question at hand." *King* at 521, 494 P.2d at 721. The court further stated that, while "*[i]t is often difficult to distinguish misleading representations and fraudulent concealment from mere nondisclosure* and the classification of the act or acts in question must, of course, depend on the facts of each case," it was nevertheless true that "the facts of this case . . . would be supportive of a finding of misleading representation as set forth in Restatement § 529 or fraudulent concealment as set forth in § 550." *King* at 521-22, 494 P.2d at 721-22 (emphasis added). An Oregon court advanced similar reasoning in *Paul v. Kelley*, 599 P.2d 1236 (Or. App. 1979), concluding that a duty to disclose is not necessary to prevail on a fraudulent concealment claim.

¶94     In *Paul*, the seller of real estate knew, before the closing, that he was required to install a storm sewer if a drainage ditch on the property were eliminated. Instead of

installing the storm sewer, the sellers simply filled the ditch and sold the property. Buyers of the land sued the sellers when they learned they had to put in an expensive sewer system. The sellers defended on the grounds that they had no affirmative duty to disclose the ditch to the buyers. The court found this argument meritless, stating:

> Such a duty is not necessary. . . . [A]n active concealment such as the filling in of the ditch alleged in this case is to be distinguished from a simple nondisclosure. . . . Plaintiff's complaint sets forth facts alleging an active concealment of the drainage ditch and is *sufficient without the assertion of a duty to speak*.

*Paul* at 1238-39 (emphasis added); *see also Caldwell v. Pop's Homes, Inc.*, 634 P.2d 471, 477 (Or. App. 1981) (where fraud is based on a plan of actual concealment, as opposed to simple nondisclosure, a duty to speak is not required).

¶95        "[T]he common law clearly distinguishes between concealment and nondisclosure. The former is characterized by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter. The latter is characterized by mere silence." *United States v. Colton*, 231 F.3d 890, 899 (4th Cir. 2000). "Thus, fraudulent concealment -- without any misrepresentation or duty to disclose -- can constitute common law fraud." *Id.* at 899.

¶96        The distinction is made even more clear by Prosser's description of active concealment as:

> Any words or acts which create a false impression covering up the truth, or which remove an opportunity that might otherwise have led to the discovery of a material fact--as by floating a ship to conceal the defects in her bottom, sending one who is in search of information in a direction where it cannot be obtained, or even a false denial of knowledge by one in possession of facts--are classed as misrepresentation, no less than a verbal assurance that the fact is not true.

(Footnotes omitted.) WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS § 106 at 695 (4th ed. 1971) ("Prosser IV"). Prosser discusses simple nondisclosure as a separate category, usually requiring a duty to speak before silence will be actionable. PROSSER IV at 695-99.

¶97    The Funds in the instant case allege the Bank actively strategized to cover up the pending collapse of Symington's financial condition. This allegation fits the definition of concealment, not nondisclosure. Three evidentiary points are clear: the "unjustified and imprudent" loan extensions; the forbearance until one day after the due date for the Mercado take-out obligation; and the failure to report Symington's false statements to federal banking authorities. The record reveals evidence of internal bank communications and communication between Symington aides and the Bank. Applying the law, we conclude that the Funds were not required to establish an affirmative duty to speak in order to prove fraudulent concealment. Actions by the Bank which intended to conceal material facts are, if proven, sufficient.

¶98    In the final analysis, we reach two conclusions as to the

-54-

fraudulent concealment claim: there are reasonable inferences from which a jury could find (1) the Bank had knowledge of false information being given the Funds, and (2) the Bank took measures intended to prevent the Funds from learning the truth. These inferences are grounded in fact and are sufficient to take the concealment theory to the jury under the applicable clear and convincing standard.[24]

### E.   Civil Conspiracy to Commit Fraud

**¶99**      "For a civil conspiracy to occur two or more people must agree to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means, causing damages." *Baker v. Stewart Title & Trust of Phoenix*, 197 Ariz. 535, 542, 5 P.3d 249, 256 ¶30 (App.

---

[24] Although courts in other jurisdictions are not in agreement regarding the standard of proof required for fraudulent concealment, we follow those requiring clear and convincing evidence. *See Aksomitas v. Aksomitas*, 529 A.2d 1314 (Conn. 1987); *Hughes v. Holt*, 435 A.2d 687 (Vt. 1981); *Haleyville Health Care Center v. Winston County Hosp. Bd.*, 678 So. 2d 789 (Ala. 1996); *Webb v. Pomeroy*, 655 P.2d 465 (Kan. App. 1982); *but see Kracl v. Loseke*, 461 N.W.2d 67, 72 (Neb. 1990) (to maintain an action for fraudulent concealment, the plaintiff must prove the elements by a preponderance of the evidence); *Hebron Public School Dist. No. 13 of Morton County v. U.S. Gypsum Co.*, 475 N.W.2d 120, 124 (N.D. 1991) (fraudulent concealment must be established to the satisfaction of the jury by a fair preponderance of the evidence); *Kopeikin v. Merchants Mortgage and Trust Corp.*, 679 P.2d 599, 601 (Colo. 1984) (defendant asserts petitioners could not have proven fraudulent concealment by a preponderance of the evidence).

We adopt the heightened standard for this tort because fraudulent concealment is essentially the equivalent of fraud by a misrepresentation. *See* RESTATEMENT (SECOND) OF TORTS § 550 (1976). Fraud unquestionably requires clear and convincing evidence. *Rice v. Tissaw,* 57 Ariz. 230, 237, 112 P.2d 866, 869 (1941).

2000) (quoting *Rowland v. Union Hills Country Club*, 157 Ariz. 301, 306, 757 P.2d 105, 110 (1988)); *see also* RESTATEMENT (SECOND) OF TORTS § 876. "A mere agreement to do a wrong imposes no liability; an agreement plus a wrongful act may result in liability." *Baker* at 542, 5 P.3d at 256 (citations omitted). In short, liability for civil conspiracy requires that two or more individuals agree and thereupon accomplish "an underlying tort which the alleged conspirators agreed to commit." *Id.* at 545, 5 P.3d at 259. Here, the underlying wrong is Symington's fraud via submission of fraudulent financial statements to the Funds. The Bank denies any agreement to defraud.

¶100 Ultimately, the correspondence between Bank agents and Symington's aides, coupled with meetings among Symington, his aides, and bank officials and the ensuing results raise serious questions about the Bank's activity. But a claim for civil conspiracy must include an actual agreement, proven by clear and convincing evidence,[25] and although the Bank's conduct is suspicious, evidence of an agreed upon conspiratorial arrangement, on this record, cannot rise to the clear and convincing level. See *Elliott v. Videan,* 164 Ariz. 113, 116, 791 P.2d 639, 642 (App. 1989).

¶101 There is a qualitative difference between proving an

---

[25] Civil conspiracy to commit fraud requires clear and convincing evidence. *Elliot v. Videan*, 164 Ariz. 113, 116, 791 P.2d 639, 642 (App. 1989).

*agreement* to participate in a tort, *i.e.*, a civil conspiracy, and proving knowing action that substantially aids another to commit a tort. *Halberstam* at 478. Even though legitimate fact questions exist on the Funds' claims of aiding and abetting, bad faith, intentional interference, and concealment, it is unreasonable to infer a conspiratorial agreement. *Leahey* at 537 (court upheld jury verdict finding defendant guilty of aiding and abetting fraud but struck down jury finding that defendant conspired to commit fraud because it was unreasonable for jury to conclude defendant agreed to join in the scheme).

¶102    Accordingly, we affirm summary judgment of the Funds' civil conspiracy claim.

## IV.    Conclusion

¶103    The Funds correctly emphasize that the case is here in opposition to the summary judgment entered in the Bank's favor, claiming they are entitled to take their case to the jury with all reasonable inferences to be drawn from the facts. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The inquiry on a motion for summary judgment unavoidably asks whether reasonable jurors could find by the appropriate evidentiary standard that the plaintiff is entitled to a verdict, *i.e.*, whether there is "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Accordingly, the issue here is whether the evidence is sufficient to overcome a motion for

summary judgment.  Our evaluation focused exclusively on the five allegations made in the Funds' counterclaim, the evidence offered in support of those allegations, and the arguments made in the court of appeals and the petition for review to this court.

¶104    In light of the evidence, we hold that summary judgment was premature as to all claims except the claim of civil conspiracy.  Thus, the court of appeals ruling on civil conspiracy is affirmed.  As to the other claims, the opinion of the court of appeals is vacated, the judgment of the trial court is reversed, and this case is remanded to the trial court for proceedings consistent with this opinion.

¶105    Because of our decision to remand, we also vacate the existing award of attorneys' fees to the Bank.  Attorneys' fees, if any, will be recoverable at the termination of the proceedings in the trial court.

_____
Charles E. Jones
CONCURRING:                             Chief Justice


_____
Ruth V. McGregor, Vice Chief Justice

_____
Stanley G. Feldman, Justice

_____
Thomas A. Zlaket, Justice

M A R T O N E, Justice, concurring in part and dissenting in part.

¶106     I agree with the court that the absence of a duty to disclose is not fatal to the assertion of intentional tort claims. This is the issue decided by the court of appeals upon which review was sought.  I would thus remand the case to the court of appeals for consideration of those issues presented to but not decided by it.  The court instead proceeds to examine the sufficiency of the evidence in this case as to each of five separate counts.  In the process it sweeps broadly, drawing on decisions from scores of other courts, to set forth, in dicta, rules for Arizona on issues not briefed by the parties.  *See, e.g., ante*, at ¶ 58 n.16.  To illustrate, the court concludes that the tort of aiding and abetting fraud, unlike fraud itself, requires proof only by a preponderance of the evidence.  I would like to have seen this issue briefed and argued.  I should think that if fraud requires proof by clear and convincing evidence, aiding and abetting fraud would require the same.

¶107     Rule 23 (i)(3), Ariz. R. Civ. App. P., provides that if issues were raised in, but not decided by, the court of appeals, we may consider them or remand to the court of appeals to decide them in the first instance.  Given the fact intensive nature of the inquiry and the wide range of views expressed nationally on the torts alleged, it is best to have such issues decided in the court in which they were raised and briefed.  I thus concur in the

judgment but dissent from the court's opinion.

_____
Frederick J. Martone, Justice