175 P.3d 687

**Vickie GREENWOOD; Jonny Speer, a single woman, Plaintiffs/Appellants,**

v.

**The STATE of Arizona, a body politic; Sheriff Joe Arpaio, Defendants/Appellees.**

No. 1 CA–CV 07–0155.

Court of Appeals of Arizona, Division 1, Department C.

Jan. 22, 2008.

---

Fennemore Craig, P.C. By Marc H. Lamber, Theresa Dwyer, Alexander R. Arpad, Phoenix, Attorneys for Plaintiffs/Appellants.

Iafrate & Associates By Michele M. Iafrate, Phoenix, Attorneys for Defendant/Appellee State of Arizona.

Swenson, Storer, Andrews, Frazelle & Riviere, P.C. By Michael J. Frazelle, Kimberly J. Sayre, Phoenix, Attorneys for Defendant/Appellee Sheriff Joe Arpaio.

## OPINION

WINTHROP, Judge.

¶ 1 Vickie Greenwood, as surviving parent of Amanda McCormick, and Jonny Speer (collectively "Plaintiffs") appeal the trial court's grant of summary judgment in favor of the State of Arizona and Maricopa County Sheriff Joe Arpaio (collectively "Defendants") on Plaintiffs' negligence claim. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY[1]

¶ 2 On January 5, 2003, while fleeing from Phoenix police officers through city streets at a speed of more than seventy miles per hour, Miguel Angel Tolentino–Ortiz struck Ms. McCormick's vehicle, killing her and severely injuring her passenger, Ms. Speer. Tolentino–Ortiz was later convicted of second degree murder, aggravated assault, theft of a means of transportation, and aggravated driving under the influence of alcohol ("DUI") in connection with this collision.

¶ 3 At the time of the collision, Tolentino–Ortiz had a lengthy criminal history, including six prior arrests by various Arizona law enforcement agencies for DUI and DUI-related offenses.[2] As relevant to this case, the Arizona Department of Public Safety ("DPS") arrested Tolentino–Ortiz on January 19, 2002, for theft of a means of transportation, unlawful flight, endangerment, DUI,

and failure to produce a driver's license. Tolentino–Ortiz provided the alias Gerardo Montiel to the arresting officer, and he was processed into the Cochise County Jail under this name.[3] On January 20, 2002, Tolentino–Ortiz's fingerprints were submitted to Arizona's fingerprint database, the Automated Fingerprint Identification System ("AFIS"), for comparison to the fingerprints of past offenders. Although Tolentino–Ortiz's fingerprints were stored in AFIS as a result of one of his earlier arrests, the fingerprint technician failed to correctly process Tolentino–Ortiz's fingerprints and AFIS failed to match them to those on file for Tolentino–Ortiz. As a result, AFIS assigned the submitted fingerprints a unique identification number instead of associating them with Tolentino–Ortiz and his prior criminal behavior.

¶ 4 The following day, the National Crime Information Center ("NCIC") alerted Arizona authorities that the same fingerprints had been assigned two identification numbers. AFIS did not correct this error until April 1, 2002, when it consolidated its records to reflect that the fingerprints submitted on January 20, 2002 belonged to Tolentino–Ortiz.

¶ 5 In the meantime, Cochise County Probation Officer Francisco Villegas relied on the non-updated version of Tolentino–Ortiz's criminal history information in preparing a presentence report recommending that the court sentence Tolentino–Ortiz to probation for his January 19, 2002 criminal conduct. Tolentino–Ortiz pled guilty to felony charges of theft of a means of transportation and endangerment. Unaware that Tolentino–Ortiz had a prior criminal history, the Cochise County Superior Court placed him on unsupervised probation for five years and, as a condition of his probation, ordered that he was not to re-enter the United States without

1. Although the material facts are largely undisputed, on an appeal from summary judgment, we state the facts in the light most favorable to Plaintiffs, against whom the trial court entered judgment. *Unique Equip. Co., Inc. v. TRW Vehicle Safety Sys., Inc.*, 197 Ariz. 50, 52, ¶ 5, 3 P.3d 970, 972 (App.1999).

2. In addition, Tolentino–Ortiz had been arrested by federal authorities and deported to Mexico on nine occasions after illegally crossing the United States border with Mexico.

3. Tolentino–Ortiz repeatedly provided false names and dates of birth to law enforcement authorities.

permission.[4]    Federal authorities arrested Tolentino–Ortiz at the Cochise County Jail on April 19, 2002, and, on May 7, 2002, he was ordered deported to Mexico.

¶ 6  On October 2, 2002, Tolentino–Ortiz was again arrested by DPS after an officer observed him driving a stolen vehicle, swerving, speeding, and ultimately colliding with four other vehicles.  DPS booked Tolentino–Ortiz into Maricopa County Jail, whereupon jail personnel submitted Tolentino–Ortiz's fingerprints to AFIS and received Tolentino–Ortiz's consolidated criminal history.  Tolentino–Ortiz's conduct clearly violated the terms of probation previously imposed by the Cochise County Superior Court; however, it is undisputed that no Maricopa County Jail personnel notified the Cochise County Attorney's Office or the Cochise County Probation Department of Tolentino–Ortiz's probation violation.  Soon after his arrest, federal immigration authorities placed a detainer on Tolentino–Ortiz and, on October 30, 2002, took custody of him from the Maricopa County Sheriff's Office and deported him to Mexico.  Sometime thereafter, Tolentino–Ortiz reentered the United States and, on January 5, 2003, caused the vehicle collision that killed Ms. McCormick and seriously injured Ms. Speer.

¶ 7  On December 23, 2003, Plaintiffs initiated this action for negligence against the State and Sheriff Arpaio.[5]  Plaintiffs alleged that the State, through DPS, and the Sheriff breached a duty to properly maintain and disseminate Tolentino–Ortiz's criminal history, to report to other law enforcement agencies on his outstanding criminal warrants, and to report to or otherwise alert his Cochise County Probation Officer that Tolentino–Ortiz had violated the terms of his probation.

4.  The court also ordered Tolentino–Ortiz to serve 90 days in the Cochise County Jail but gave him credit for 90 days of presentence incarceration.

5.  Plaintiffs also asserted claims against DPS, the City of Phoenix, the City of Phoenix Police Department, Maricopa County, and the Maricopa County Sheriff's Office.  These defendants were all eventually dismissed by stipulation or motion.

6.  In addition, the court ruled that Plaintiffs could not state a claim against Sheriff Arpaio based on

¶ 8  On August 15, 2006, Sheriff Arpaio moved for summary judgment, arguing that Plaintiffs could not show that he had breached a duty of care because the Sheriff did not have a duty to notify other law enforcement agencies of an arrestee's criminal history, probation violations, or the like.  He also argued that he could not be held jointly and severally liable with Tolentino–Ortiz and that any liability must be comparative.

¶ 9  Shortly thereafter, the State also moved for summary judgment, arguing that because Plaintiffs could not demonstrate any gross negligence on the part of the State employees involved, the State was entitled to the qualified immunity extended by Arizona Revised Statutes ("A.R.S.") section 12–820.02(A)(1) (2003) to law enforcement agencies for the alleged failure to properly retain an arrested person in custody.  In addition, the State argued that DPS's conduct was not the proximate cause of Plaintiffs' injuries.  Sheriff Arpaio later joined the State's proximate cause argument.

¶ 10  After oral argument, the trial court granted the Defendants' motions, ruling that A.R.S. § 12–820.02(A)(1) applied and that the Plaintiffs had offered no evidence of gross negligence.  The court also ruled that the Plaintiffs had offered no credible evidence that Defendants' acts were the proximate cause of the injury.[6]  The trial court entered a formal judgment on January 2, 2007.

¶ 11  Plaintiffs timely appealed the judgment.  We have jurisdiction pursuant to A.R.S. § 12–2101(B) (2003).

## ANALYSIS

¶ 12  Plaintiffs challenge on appeal the trial court's rulings that A.R.S. § 12–820.02(A)(1) grants the State and Sheriff Arpaio qualified immunity for Plaintiffs' claims [7]

joint and several liability because Arizona applies a comparative fault analysis to negligence claims.

7.  Plaintiffs contend that the trial court erred in granting summary judgment for Sheriff Arpaio under A.R.S. § 12–820.02 because Sheriff Arpaio did not expressly move for summary judgment on the basis of qualified immunity.  It is undisputed that Sheriff Arpaio did not raise this issue in his motion for summary judgment.  However,

and that the State's and Sheriff Arpaio's alleged negligence was not the proximate cause of Plaintiffs' injuries. As we find the resolution of the qualified immunity issue to be dispositive, we do not address the other issues raised on appeal.

¶ 13 We review an award of summary judgment *de novo*, both as to whether there are any genuine issues of material fact and as to whether the moving party is entitled to judgment as a matter of law. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund,* 201 Ariz. 474, 482, ¶¶ 13–14, 38 P.3d 12, 20 (2002).

¶ 14 In Arizona, government entities and employees are generally subject to tort liability for their negligence, and immunity is the exception. *City of Tucson v. Fahringer,* 164 Ariz. 599, 600, 795 P.2d 819, 820 (1990) (citation omitted). In 1984, the legislature enacted the Actions Against Public Entities or Public Employees Act, codified at A.R.S. §§ 12–820 to –823 (2003),[8] to address the issue of governmental liability for certain negligent acts. *Bird v. State,* 170 Ariz. 20, 21–22, 821 P.2d 287, 288–89 (App.1991). In that act, the legislature delineated several specific acts for which public entities and employees are extended a qualified immunity. *See* A.R.S. § 12–820.02.[9] As relevant in this case, A.R.S. § 12–820.02, entitled "Qualified Immunity," provides:

A. Unless a public employee acting within the scope of the public employee's employment intended to cause injury or was grossly negligent, neither a public entity nor a public employee is liable for:

1. The failure to make an arrest or the failure to retain an arrested person in custody.

¶ 15 Plaintiffs argue that the statute does not afford Defendants immunity from Plaintiffs' claims because they did not allege that Defendants had failed to arrest or retain Tolentino–Ortiz. Rather, Plaintiffs assert that their allegations related only to Defendants' "recordkeeping," specifically, Defendants' failure to exercise reasonable care in gathering and disseminating information and failure to meet the statutory requirements for collecting and maintaining criminal history records and other criminal justice information.

¶ 16 Our primary goal in interpreting a statute is to determine and give effect to the intent of the legislature. *In re Estate of Jung,* 210 Ariz. 202, 204, ¶ 12, 109 P.3d 97, 99 (App.2005). To ascertain intent, we examine the language of the statute at issue, "the context of the statute, the language used, the subject matter, its historical background, its effects and consequences, and its spirit and purpose." *Id.* As immunity of government entities and employees is the exception in

we find no error in the trial court's consideration of whether A.R.S. § 12–820.02 applies to Sheriff Arpaio. *See Juge v. County of Sacramento,* 12 Cal.App.4th 59, 15 Cal.Rptr.2d 598, 605 (1993) (holding that a "trial court has the inherent power to grant summary judgment on a ground not explicitly tendered by the moving party" if the party opposing the motion had an opportunity to respond to the issue). First, Sheriff Arpaio raised qualified immunity as a defense in his answer and in the parties' joint pre-trial statement; therefore, Plaintiffs were on notice that Sheriff Arpaio would be arguing at trial that he was entitled to the application of qualified immunity. Second, the issue was one of law and was fully briefed by Plaintiffs in response to the State's motion for summary judgment. While Plaintiffs were not required to argue below that Sheriff Arpaio was grossly negligent because the Sheriff did not move for summary judgment based on the immunity statute, Plaintiffs do not argue on appeal that they would have made a different argument in response to a similar mo-

tion by the Sheriff or were otherwise prejudiced by the trial court's consideration of whether the statute applied to the Sheriff. Lastly, even if the trial court had improperly granted summary judgment for Sheriff Arpaio under A.R.S. § 12–820.02, it would not affect our determination in this appeal, as we will affirm the entry of summary judgment if it is correct for any reason. *Hawkins v. State,* 183 Ariz. 100, 103, 900 P.2d 1236, 1239 (App.1995); *cf. Gibbs v. Basham,* 53 Ariz. 357, 365, 89 P.2d 630, 633 (1939) (holding that the appellate courts can consider and determine on appeal an issue not raised below if it could have been raised and determined at the trial court level).

8. We cite the current version of the statutes when no revisions material to the decision have occurred.

9. The constitutionality of this statute was upheld by our supreme court in *Clouse ex rel. Clouse v. State,* 199 Ariz. 196, 16 P.3d 757 (2001).

Arizona, *Fahringer*, 164 Ariz. at 600, 795 P.2d at 820, we narrowly construe immunity provisions applicable to government entities. *Doe ex rel. Doe v. State*, 198 Ariz. 98, 100, ¶ 6, 7 P.3d 107, 109 (App.2000), *vacated on other grounds*, 200 Ariz. 174, 24 P.3d 1269 (2001). We may not, however, construe an immunity provision so narrowly as to abrogate the legislature's grant of immunity. *Id.*

¶ 17 The plain language of A.R.S. § 12–820.02(A)(1) applies governmental immunity only to the failure to make an arrest or to retain an arrested person. It thus initially appears that the statute does not apply to Plaintiffs' claims because Plaintiffs did not allege that Defendants failed to arrest or retain Tolentino–Ortiz. Defendants assert, however, that they are entitled to qualified immunity under this provision because Plaintiffs' allegations are, in essence, allegations that Defendants failed to arrest or retain Tolentino–Ortiz. In particular, Defendants cite Plaintiffs' allegations that if Defendants had properly maintained or disseminated Tolentino–Ortiz's criminal record, Tolentino–Ortiz would have been incarcerated at the time he caused the collision that killed Ms. McCormick and injured Ms. Speer. Defendants argue that although Plaintiffs did not couch their allegations in the language of the statute, the essence of their complaint is that Defendants failed to retain Tolentino–Ortiz. Resolving this dispute requires us to construe A.R.S. § 12–820.02(A)(1) to determine whether Plaintiffs' allegations regarding Defendants' recordkeeping failures fall under the "failure to arrest or retain" language of the statute.

¶ 18 We previously examined the legislative purpose and intent of A.R.S. § 12–820.02 in *Walls v. Ariz. Dep't of Pub. Safety*, 170 Ariz. 591, 826 P.2d 1217 (App.1991). In that case, the plaintiffs alleged that a DPS officer was negligent in failing to stop a motorist after the officer observed the motorist's vehicle weaving in traffic and before the motorist collided with the plaintiffs' vehicle. *Walls*, 170 Ariz. at 593, 826 P.2d at 1219. DPS moved for summary judgment on the basis that A.R.S. § 12–820.02 provided qualified immunity for the officer's acts. *Id.* The plaintiffs disputed that the statute applied, arguing that their claim was based on the officer's failure to make an investigatory stop, not his failure to arrest the motorist, as specifically addressed in the statute. *Id.*

¶ 19 After evaluating the historical note to A.R.S. § 12–820 (2003),[10] this court found that although it was clear that "the legislature intended to limit sovereign immunity to certain specific, enumerated circumstances, it is also clear that the legislature recognized that sovereign immunity is sometimes necessary given the breadth of the government's exercise of power." *Walls*, 170 Ariz. at 594, 826 P.2d at 1220. Recognizing that an investigatory stop is often a precursor to an arrest, the court held that no distinction should be made between an investigatory stop and an arrest for the purpose of determining the applicability of the qualified immunity statute. *Id.* The court therefore interpreted the phrase "failure to make an arrest" to include a failure to make an investigatory stop and held that DPS was entitled to qualified immunity. *Id.* at 595, 826 P.2d at 1221. Noting that the plaintiffs' evidence was not sufficient to create a question of fact regarding whether the officer acted with gross negligence, this court affirmed the trial court's grant of summary judgment for DPS. *Id.* at 596, 826 P.2d at 1222.

¶ 20 In *Clouse*, our supreme court did not specifically address the scope of A.R.S. § 12–820.02(A)(1), but rather focused on the primary issue raised of whether the statute

---

10. The historical and statutory notes to A.R.S. § 12–820 provide, in relevant part:

    **Section 1. Legislative purpose and intent**
    The legislature recognizes the inherently unfair and inequitable results which occur in the strict application of the traditional doctrine of sovereign immunity. On the other hand, the legislature recognizes that, while a private entrepreneur may readily be held liable for negligence within the chosen scope of his activity, the area within which government has power to act for the public good is almost without limit and therefore government should not have the duty to do everything that might be done. Consequently, it is hereby declared to be the public policy of this state that public entities are liable for acts and omissions of employees in accordance with the statutes and common law of this state. All of the provisions of this act should be construed with a view to carry out the above legislative purpose.

constituted an impermissible abrogation of a "common law" right to bring an action for injuries against the government. 199 Ariz. at 197, ¶ 1, 16 P.3d at 758. Nonetheless, we note that the underlying facts in *Clouse* allegedly giving rise to liability involved the failure of one or more law enforcement agencies to file a criminal complaint against an individual who committed crimes in adjoining Arizona counties. *Id.* at ¶¶ 2–3. That individual was arrested and detained in one county, and was in the process of being transferred to the other county when the lack of a filed criminal complaint was discovered. *Id.* at ¶ 3. Following the apparent dictates of Arizona Rule of Criminal Procedure 4.1, the prisoner was released by the side of the highway. *Id.* He fled Arizona, but then committed multiple grievous crimes, including murder, in New Mexico. *Id.* at 197–98, ¶¶ 3–4, 16 P.3d at 758–59. A civil action was brought in Arizona to recover damages against various government agencies and employees. *Id.* at 198, ¶ 5, 16 P.3d at 759. The trial court applied A.R.S. § 12–820.02(A)(1), and was ultimately affirmed by the supreme court. *Id.* at 204, ¶ 29, 16 P.3d at 765. In its opinion, the supreme court characterized the failure to file the criminal complaint as a failure to retain an arrested person in custody, thus triggering the application of A.R.S. § 12–820.02(A)(1). *Id.* at 203, ¶ 26, 16 P.3d at 765.

¶ 21 Here, Plaintiffs and the State disagree concerning the applicability of *Clouse*. The State contends that *Clouse* stands in part for the proposition that A.R.S. § 12–820.02(A)(1) applies to allegations of negligent recordkeeping. Again, we note that the supreme court in its opinion did not explicitly consider the scope of the statute, but rather dealt with the constitutional issue raised. Plaintiffs contend that *Clouse* is simply not relevant, arguing that the purpose of the statute is to protect law enforcement officials when they have to make quick judgments on whether to arrest or retain a person, and not to immunize the failure to keep, correct, and properly transmit accurate records. While Plaintiffs' characterization of the statutory purpose has some superficial appeal, we are not aware of any way to draw a meaningful distinction between immediate action required of law enforcement (such as whether to arrest or retain an individual) and some other failure on the part of the government (such as recordkeeping), which, although perhaps taking place over a longer period of time, arguably results in the same harm: an individual not arrested or improperly released ultimately causing harm to third parties.

¶ 22 Here, Plaintiffs have not alleged that Defendants failed to arrest or retain Tolentino–Ortiz, allegations to which the statute would clearly apply. However, the essence of Plaintiffs' allegations is that if Defendants had properly maintained and communicated Tolentino–Ortiz's criminal history, he would have been in custody on January 5, 2003, and would not have been in a position to have caused the death of Ms. McCormick and the injuries to Ms. Speer.[11] Although Plaintiffs framed their allegations in terms of recordkeeping, they did not allege that the recordkeeping, in and of itself, caused them harm.[12] Instead, they alleged that the faulty recordkeeping resulted in Tolentino–Ortiz being out of custody on January 5, 2003, and, as a result, he was able to harm Plaintiffs. This is the type of allegation that the legislature intended the qualified immunity statute to cover because, at its core, it is an allegation that Defendants failed to arrest or retain Tolentino–Ortiz in custody.[13] Further, if

11. Indeed, Plaintiffs' proximate cause argument is premised on such a view.

12. For example, if, as a result of a recordkeeping error, an individual was terminated from employment conditioned upon the absence of a criminal record, that individual's negligence claim would arise directly from the recordkeeping error.

13. We further observe that in at least one other jurisdiction that, like Arizona, has adopted the framework of governmental immunity as an exception, a claim of negligent recordkeeping, which, in turn, led to a dangerous individual being "at large" and in a position to harm third parties, is properly considered to constitute a claim of improper release, and therefore covered by that state's express statutory qualified immunity provision. *See, e.g., Buford v. California*, 104 Cal.App.3d 811, 164 Cal.Rptr. 264, 270 n. 3 (1980) (holding that the alleged failure to keep adequate records and to properly inform other state and local law enforcement agencies, which purportedly led to the improper granting of a leave of absence from a state mental hospital of a

qualified immunity were inapplicable simply because the form of Plaintiffs' allegations did not mimic the statute, it would encourage plaintiffs to purposely plead their claims to avoid the application of the statute. Applying qualified immunity in this case is therefore appropriate and necessary to avoid abrogating the immunity granted to Defendants by the legislature.[14]

## CONCLUSION

¶ 23 We hold that, pursuant to A.R.S. § 12–820.02(A)(1), Defendants are entitled to qualified immunity for Plaintiffs' claims. As Plaintiffs offered no argument or evidence that Defendants' conduct constituted gross negligence, the trial court properly granted summary judgment for Defendants.

CONCURRING: MICHAEL J. BROWN, Presiding Judge and DONN KESSLER, Judge.

dangerous patient who ultimately injured third parties, was entitled to the qualified immunity provided by state statute for any injuries caused by a patient in a state mental institution); *Hernandez v. California*, 11 Cal.App.3d 895, 90 Cal. Rptr. 205, 207–08 (1970) (construing the statute extending immunity for determinations to parole or release a person from confinement for mental illness in a state mental facility to cover allegations of failure to keep adequate records related to treatment and confinement of such a patient, as required by state statute).

14. We disagree with Plaintiffs that this result is inconsistent with A.R.S. § 41–1750 (Supp.2006), which requires DPS to maintain and disseminate criminal records for the whole state. The legislature's delegation of these responsibilities to DPS does not prohibit the legislature from also providing qualified immunity to DPS for its performance of these tasks.