IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ROBIN ROEBUCK, *Plaintiff/Appellant*,

*v.*

MAYO CLINIC, et al., *Defendants/Appellees*.

No. 1 CA-CV 22-0508
FILED 9-19-2023

Appeal from the Superior Court in Maricopa County
No. CV2021-090429
The Honorable Rodrick J. Coffey, Judge

**REVERSED AND REMANDED**

COUNSEL

Law Office of Robert M. Gregory, P.C., Gilbert
By Robert M. Gregory
*Counsel for Plaintiff/Appellant*

Quintairos, Prieto, Wood & Boyer, P.A., Scottsdale
By Vincent J. Montell, Rita J. Bustos, Samantha L. Butler
*Counsel for Defendants/Appellees*

**OPINION**

Presiding Judge Maria Elena Cruz delivered the opinion of the Court, in which Judge James B. Morse Jr. and Judge Daniel J. Kiley joined.

**C R U Z**, Judge:

¶1 Robin Roebuck appeals the superior court's grant of summary judgment to Mayo Clinic, Mayo Clinic Arizona, Nicole Secrest, N.P., and Robert Scott, M.D. (collectively, "the Mayo Clinic defendants"). Because Arizona Revised Statutes ("A.R.S.") section 12-516 does away with a patient's right to recover damages for ordinary negligence we hold that it violates the anti-abrogation clause of the Arizona Constitution. Accordingly, we reverse and remand.

## FACTUAL AND PROCEDURAL HISTORY

¶2 Roebuck had a heart transplant in 1993, and a second heart transplant and kidney transplant at Mayo Clinic in 2017. Thereafter, Mayo Clinic provided Roebuck's follow-up care. Roebuck was healthy until he contracted COVID-19 in 2020.

¶3 Roebuck was hospitalized on April 20, 2020, at Mayo Clinic after presenting with COVID-19 symptoms. Because he had previously received a heart transplant, Roebuck was placed under the care of Mayo Clinic's congestive heart failure team, standard Mayo Clinic procedure for admitted heart transplant patients regardless of the reason for their admission.

¶4 On April 23, 2020, a chest x-ray revealed Roebuck had developed pneumonia, and he had to be given supplemental oxygen. That same day, Dr. Hasan Ashraf, a cardiologist, ordered an echocardiogram to assess Roebuck's heart. The echocardiogram confirmed that Roebuck's heart was "doing pretty well" and that he was not having primary cardiac issues or signs of rejection. In light of Roebuck's positive COVID-19 test and the results of the echocardiogram, his doctors "proceeded with regards to the management of COVID" rather than "any cardiac kind of management."

¶5 The next day, Dr. Ashraf ordered an arterial blood gas ("ABG") test. The test, which is drawn from a patient's radial artery, measures the oxygen in the patient's arterial blood and provides doctors with more accurate information than a pulse oximeter. Dr. Ashraf ordered the ABG test because Roebuck had COVID-19 and was "becoming progressively hypoxic," and because he was suffering from metabolic acidosis as a result of his diarrhea from COVID-19. In addition, Dr. Ashraf had consulted with Mayo Clinic's infectious disease doctors who were considering giving Roebuck a monoclonal antibody, tocilizumab, to treat

his COVID-19, and ABG test results would provide necessary "additional information that would . . . support giving the tocilizumab." The results of the ABG test revealed that Roebuck had very low oxygen content in his blood, warranting treatment with tocilizumab, which he was given shortly thereafter.

¶6　　　　The next day, Roebuck developed complications from the ABG test, was diagnosed with compartment syndrome, and underwent emergency surgery on his right hand, forearm, and wrist. Roebuck was left with diminished strength and use of his right hand and arm and significant scarring.

¶7　　　　In January 2021, Roebuck filed a medical negligence suit against the Mayo Clinic defendants alleging the ABG test was negligently performed. He did not allege the Mayo Clinic defendants were grossly negligent. In March 2021, the Mayo Clinic defendants removed the action to the United States District Court for the District of Arizona, asserting federal question jurisdiction under 28 U.S.C. § 1331 based on their immunity defense under the Public Readiness and Emergency Preparedness ("PREP") Act, 42 U.S.C. §§ 247d-6d, 247d-6e. Roebuck moved to remand to state court. The district court remanded to the superior court after finding the case did not raise a federal question because it did not involve a state law claim arising under federal law or a state law claim completely preempted by a federal statute.

¶8　　　　In May 2021, Roebuck filed an amended complaint and additionally alleged that Dr. Ashraf had ordered the ABG test to evaluate his heart disease. The Mayo Clinic defendants moved to dismiss the complaint, and the superior court denied the motion. The court ordered that the scope of discovery would "initially" be limited "to the issues of the purpose of the [ABG] blood draw."

¶9　　　　The parties deposed Roebuck, Dr. Ashraf, and Mayo Clinic doctor Robert Scott, M.D. The Mayo Clinic defendants moved for summary judgment, and after briefing and oral argument, the superior court granted the motion. Although it dismissed Roebuck's claims, the court expressly stated that Roebuck was "not barred from filing an amended complaint asserting willful conduct or gross negligence [if] such claims can satisfy the requirements of Rule 11 of the Arizona Rules of Civil Procedure." Roebuck did not file an amended complaint.

¶10 After the court entered partial final judgment under Ariz. R. Civ. P. 54(b), Roebuck timely appealed. We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), -2101(A)(1).

## DISCUSSION

¶11 We review a grant of summary judgment de novo, viewing the evidence and reasonable inferences in the light most favorable to Roebuck as the non-moving party. *See Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 201 Ariz. 474, 482, ¶ 13 (2002). "Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *Id.* at ¶ 14 (citing Ariz. R. Civ. P. 56(a); *Orme Sch. v. Reeves*, 166 Ariz. 301, 309 (1990)). We review de novo the superior court's interpretation of statutes and constitutional issues. *Hohokam Irrigation & Drainage Dist. v. Ariz. Pub. Serv. Co.*, 204 Ariz. 394, 397, ¶ 5 (2003). "Legislation . . . is entitled to a strong presumption of constitutionality, and we construe a statute to give it, if possible, a reasonable and lawful meaning." *Governale v. Lieberman*, 226 Ariz. 443, 447, ¶ 7 (App. 2011). "[C]onstitutional provisions are interpreted in view of the history behind the enactment, the purpose sought to be accomplished by its enactment and the evil sought to be remedied." *Ruth v. Indus. Comm'n*, 107 Ariz. 572, 575 (1971).

I.      No Issues of Material Fact

¶12 Roebuck first argues there was a genuine issue of material fact about the purpose of the ABG procedure that should have precluded summary judgment. We disagree. The deposition testimony of Drs. Ashraf and Scott unequivocally established that the ABG test was performed to assess and treat Roebuck for COVID-19. Although Roebuck complains of a purported "incongruity" in Dr. Ashraf's explanation of the reason for the ABG test, we find no such incongruity. The fact that Roebuck had undergone an ABG test in 2017 for non-COVID-19 related reasons does not negate the uncontroverted testimony of Drs. Ashraf and Scott that Dr. Ashraf ordered the ABG test in 2020 as part of Roebuck's treatment for COVID-19.

II.     Ambiguity

¶13 Roebuck next argues A.R.S. § 12-516 is ambiguous. "If a statute's language is clear and unambiguous, we apply it without resorting to other methods of statutory interpretation. Ambiguity exists if there is uncertainty about the meaning or interpretation of a statute's terms." *Hayes*

*v. Cont'l Ins. Co.*, 178 Ariz. 264, 268 (1994) (citations omitted). The statute provides, in relevant part:

**A.** If the governor declares a state of emergency for a public health pandemic[1] pursuant to title 26, chapter 2, a health care professional or health care institution that acts in good faith is not liable for damages in any civil action for an injury or death that is alleged to be caused by the health professional's or health care institution's action or omission while providing health care services in support of this state's response to the state of emergency declared by the governor unless it is proven by clear and convincing evidence that the health professional or health care institution failed to act or acted and the failure to act or action was due to that health professional's or health care institution's wilful misconduct or gross negligence.

**B.** Subsection A of this section applies to any action or omission that is alleged to have occurred during a person's screening, assessment, diagnosis or treatment and that is related to the public health pandemic that is the subject of the state of emergency . . . .

. . . .

**E.** This section applies to all claims that are filed before or after September 29, 2021 for an act or omission by a person that occurred on or after March 11, 2020 and that relates to a public health pandemic that is the subject of the state of emergency declared by the governor.

Roebuck argues subsections A and B of the statute are ambiguous because "[i]t is unclear if this language suggests that any medical care rendered during a pandemic extends immunity to the healthcare provider, or does the medical care in question have to be exclusively done in treatment of a pandemic-related condition, or does immunity arise when the assessment, diagnosis or treatment is via a medical procedure that was developed specifically for the pandemic-related condition?"

---

[1] Governor Ducey declared a state of emergency regarding the COVID-19 pandemic on March 11, 2020, and terminated the state of emergency on March 30, 2022.

¶14 We disagree. The language in subsection A stating "while providing health care services in support of this state's response to the state of emergency declared by the governor," is clear and unambiguous, as is the language in subsection B stating that the statute applies "to any action or omission that is alleged to have occurred during a person's screening, assessment, diagnosis or treatment and that is related to the public health pandemic that is the subject of the state of emergency." Section 12-516 unequivocally shields health care providers from ordinary negligence claims relating to their provision of pandemic-related medical treatment.

III. Retroactivity

¶15 Roebuck argues that § 12-516 was not in effect in April 2020 when he was treated by Mayo Clinic defendants. "No statute is retroactive unless expressly declared therein." A.R.S. § 1-244. Roebuck filed suit in January 2021, for alleged acts of negligence occurring in April 2020. The legislature expressly made § 12-516 retroactive when it enacted the law in September 2021. The statute states that it applies "to all claims that are filed before or after September 29, 2021 for an act or omission by a person that occurred on or after March 11, 2020 . . . ." A.R.S. § 12-516(E).

¶16 For the first time on appeal, Roebuck argues § 12-516 disturbed his "vested substantive rights" by retroactively increasing the burden of proof after he filed his complaint. "[L]egal theories must be presented timely to the trial court so that the court may have an opportunity to address all issues on their merits. If the argument is not raised below so as to allow the trial court such an opportunity, it is waived on appeal." *Cont'l Lighting & Contracting, Inc. v. Premier Grading & Utils., LLC*, 227 Ariz. 382, 386, ¶ 12 (App. 2011) (citation omitted). By not making his argument about vested substantive rights below, Roebuck has waived this argument.

IV. Anti-Abrogation Clause

¶17 Roebuck next argues the superior court erred by finding the Mayo Clinic defendants immune from liability under A.R.S. § 12-516 because the statute violates the anti-abrogation clause of the Arizona Constitution.

¶18 Article 18, Section 6 of the Arizona Constitution, the "anti-abrogation" clause, states that "[t]he right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation . . . ." The anti-abrogation clause protects a plaintiff's right of access to the courts and prohibits the "abrogation of all common law actions for negligence, intentional torts, strict liability,

defamation, and other actions in tort which trace origins to the common law." *Cronin v. Sheldon*, 195 Ariz. 531, 538-39, ¶ 35 (1999). "Because a medical malpractice action has its origins in the common law, it is protected by [the anti-abrogation] clause." *Governale*, 226 Ariz. at 447, ¶ 8 (citation omitted).

**¶19** The legislature may regulate negligence and other common law causes of action without offending the anti-abrogation clause. *Barrio v. San Manuel Div. Hosp. for Magma Copper Co.*, 143 Ariz. 101, 104 (1984); *see also Nunez v. Pro. Transit Mgmt. of Tucson, Inc.*, 229 Ariz. 117, 122-23, ¶ 25 (2012) ("We have repeatedly noted that the legislature is entitled to regulate common law tort actions, as long as a claimant is left a reasonable possibility of obtaining legal redress.") (citations and internal quotation marks omitted). "We apply the reasonable election test to distinguish between regulation and abrogation." *Duncan v. Scottsdale Med. Imaging, Ltd.*, 205 Ariz. 306, 313, ¶ 29 (2003) (citations and internal quotation marks omitted). The legislature must "leave[] a claimant reasonable alternatives or choices which . . . enable [the claimant] to bring the action." *Barrio*, 143 Ariz. at 106. "It may not, under the guise of regulation, so affect the fundamental right to sue for damages as to effectively deprive the claimant of the ability to bring the action." *Duncan*, 205 Ariz. at 313, ¶ 30 (citations and internal quotation marks omitted).

**¶20** "[T]he abrogation clause is implicated when the right of action is 'completely abolished.'" *Barrio*, 143 Ariz. at 106 (quoting *Ruth*, 107 Ariz. at 575). A statute does not abrogate a claim merely by making it more difficult for a claimant to obtain a recovery. *State Farm Ins. Cos. v. Premier Manufactured Sys., Inc.*, 217 Ariz. 222, 225, 229, ¶¶ 14, 34-37 (2007) (rejecting argument that A.R.S. § 12-2506, which abolished joint and several liability in strict products liability cases violates Article 18, Section 6); *Governale*, 226 Ariz. at 447-48, ¶¶ 8-11 (statute limiting potential expert witnesses a plaintiff may use "does not abolish the right to bring a medical malpractice action and thus is not an abrogation").

**¶21** The superior court found that § 12-516 did not abrogate Roebuck's cause of action because it does not bar his right to recover damages, but instead requires him to prove a "higher evidentiary standard in order to prevail by requiring that he prove by clear and convincing evidence that [Mayo Clinic defendants] acted with willful misconduct or gross negligence."

**¶22** To determine whether a statute impermissibly abrogates a claim of action we must perform a two-part analysis. *Duncan*, 205 Ariz. at

313, ¶ 28. First, we determine whether the cause of action at issue is one that is protected by Article 18, Section 6. *Id.* The anti-abrogation clause "prevents abrogation of all common law actions for negligence . . . ." *Cronin*, 195 Ariz. at 538, ¶ 35. Article 18, Section 6 of the Arizona Constitution protects the right to bring suits for negligence. Then, we must determine whether § 12-516 regulates a patient's right to recover damages for ordinary negligence or completely does away with that right. *Duncan*, 205 Ariz. at 313, ¶ 29.

**¶23** If § 12-516 did nothing more than raise the burden of proof for medical malpractice claimants from a "preponderance of the evidence" to "clear and convincing evidence," we would agree that the statute does not offend the anti-abrogation clause. The legislature, after all, "is empowered to set burdens of proof," *Seisinger v. Siebel*, 220 Ariz. 85, 93, ¶ 30 (2009), and the evidentiary standard necessary for a claimant to prevail may be raised without implicating Article 18, Section 6. *Cf. Nunez*, 229 Ariz. at 122-23, ¶¶ 24-25 (holding that abandoning doctrine imposing heightened standard of care on common carriers did not violate the anti-abrogation clause).

**¶24** Section 12-516 does more, however, than simply raise plaintiffs' burden of proof for COVID-related medical malpractice claims. Instead, the statute bars all claims for ordinary negligence arising out of the provision of COVID-related medical treatment. While "[t]he legislature may regulate the cause of action for negligence so long as it leaves" claimants "reasonable alternatives or choices" for bringing their claims, *Barrio*, 143 Ariz. at 106, § 12-516 leaves no such alternative available to those injured by the negligence of medical professionals in providing COVID-related treatment. Although the statute does not limit the right to assert a claim for gross negligence, the availability of relief for gross negligence is not a reasonable alternative to a claim for ordinary negligence. Ordinary negligence and gross negligence are, after all, distinct theories of liability. *Walls v. Ariz. Dep't of Pub. Safety*, 170 Ariz. 591, 595 (App. 1991) ("Gross negligence differs from ordinary negligence in quality and not degree."). A claim for gross negligence requires "a showing of gross, willful, or wanton conduct" that is not required of a plaintiff asserting a claim for ordinary negligence. *See Noriega v. Town of Miami*, 243 Ariz. 320, 326, ¶ 23 (App. 2017) (citations and internal quotation marks omitted). Section 12-516 thus denies relief to patients injured by negligence in the provision of COVID-related medical treatment who cannot make the additional showing required to establish gross negligence.

¶25        Article 18, Section 6 does not permit the legislature to wholly extinguish a particular type of claim available at common law even if alternative causes of action remain available to injured claimants.  For example, in *Hazine v. Montgomery Elevator Co.*, 176 Ariz. 340 (1993), the plaintiff who suffered personal injuries while working on an escalator brought products liability and negligence claims against the manufacturer. *Id.* at 341.  Because the plaintiff sustained the injury more than twelve years after the manufacturer sold the escalator, the manufacturer argued that the plaintiff's products liability claim was barred by the twelve-year statute of repose for products liability claims.  *Id.*  Our supreme court held that the statute of repose violated Article 18, Section 6 because it extinguished the plaintiff's products liability claim before he sustained the injury that gave rise to his claim.  *Id.* at 342.  In so holding, the *Hazine* court expressly found that "[t]he fact that the [plaintiff] could still sue on" alternative theories of "express warranty or negligence" did not render the statute of repose a permissible regulation rather than unconstitutional abrogation.  *Id.* at 342-43.  "[A] right to sue in negligence or express warranty," the *Hazine* court found, "is not a reasonable alternative to a products liability action."  *Id.* at 343.

¶26        Similarly, in *Rubino v. De Fretias*, 638 F. Supp. 182, 185-86 (D. Ariz. 1986), the court held unconstitutional a statute abrogating the right of patients to sue doctors on an assault and battery theory.  In so holding, the *Rubino* court rejected the argument that the statute constituted permissible regulation of claims arising out of medical treatment because it did not bar negligence-based claims, and so "merely limit[ed] the theories upon which" relief may be sought.  *Id.* at 185.  Because battery and negligence claims "constitute separate causes of action" that arise out of "distinct societal interest[s] in the physician-patient relationship," the court concluded, the preservation of negligence claims was not enough to render the abrogation of battery claims a "mere[] regulat[ion] [of] the right to sue."  *Id.* at 185-86.

¶27        Pursuant to *Hazine* and consistent with *Rubino*, we find the fact that A.R.S. § 12-516 preserves claims for gross negligence insufficient to render the statute's absolute bar to ordinary negligence claims a permissible "regulation" of the right to sue for medical malpractice. Accordingly, we hold that A.R.S. § 12-516's prohibition on the assertion of ordinary negligence claims in providing COVID-related medical treatment constitutes an abrogation of a common law right of action in violation of Article 18, Section 6.

¶28        Our holding is consistent with cases finding unconstitutional statutes that raise "an absolute bar to recovery of damages by a particular

category of persons who otherwise could proceed with an action for damages." *City of Tucson v. Fahringer*, 164 Ariz. 599, 603 (1990). For example, in *Little v. All Phoenix S. Cmty. Mental Health Ctr., Inc.*, 186 Ariz. 97 (App. 1995), this Court held unconstitutional a statute absolving mental health providers of liability for injuries inflicted by patients on third parties unless the patient communicated to the mental health provider "an explicit threat" to a "clearly identified or identifiable victim." *Id.* at 102, 105 (citation omitted). We found that, by allowing recovery only to plaintiffs who were targets of "explicit threat[s]" by mental health patients, the statute "effectively abolishe[d] a cause of action" otherwise available to other plaintiffs who did not "fit within the confines of the statute" but were still "subject to probable risk of the patient's violent conduct." *Id.* at 105 (citation omitted). Similarly, in *Young Through Young v. DFW Corp.*, 184 Ariz. 187 (App. 1995), *abrogated on other grounds as recognized by Torres v. JAI Dining Servs. (Phoenix), Inc.*, 253 Ariz. 66, 77, ¶ 37 (App. 2022), we held that a statute limiting dramshop liability to instances where alcohol was served to an "obviously intoxicated" patron violated Article 18, Section 6 by denying recovery to those who were injured by drivers who had been over-served but were not "obviously intoxicated." *Id.* at 190.

**¶29** A.R.S. § 12-516 bars claims for medical negligence by a subcategory of patients, *i.e.*, those whose medical treatment was COVID-related. Accordingly, we hold that denying recovery to a subcategory of medical negligence plaintiffs who would otherwise be entitled to assert a claim violates Article 18, Section 6 of the Arizona Constitution.

V.    PREP Act

**¶30** The Mayo Clinic defendants argue that Roebuck's claims are also barred by the PREP Act, 42 U.S.C. §§ 247d-6d, 247d-6e. They contend that as covered persons administering a countermeasure to combat COVID-19, the Act provides them immunity from suit under federal and state law. *See* 42 U.S.C. § 247d-6d(a)(1). The Act states in relevant part:

> [A] covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure.

42 U.S.C. § 247d-6d(a)(1).

¶31      In disregarding the PREP Act as a basis to grant the Mayo Clinic defendants' motion for summary judgment, the superior court ruled that Roebuck's state law claims are not barred by the PREP Act.  To reach this conclusion, the superior court relied on the district court's jurisdictional determination that "[t]he PREP Act does not satisfy the Ninth Circuit's complete preemption test because it does not completely replace state laws related to COVID-19 and does not provide a substitute cause of action for Mr. Roebuck's medical negligence claim."  But the question of whether the Mayo Clinic defendants were entitled to remove the action to federal court, as permitted by one of the two exceptions to the well-pleaded complaint rule that the Ninth Circuit Court has articulated, is separate from the question of whether the PREP Act offers the Mayo Clinic defendants immunity from suit in state court.  *See City of Oakland v. BP PLC*, 969 F.3d 895, 903-06 (9th Cir. 2020).

¶32      Federal courts have held that "preemption is a defense that does not present a federal question," meaning that the fact that a defendant may raise an immunity defense by way of federal preemption does not mean that a federal question is necessarily involved.  *Shapnik v. Hebrew Home for the Aged at Riverdale*, 535 F. Supp. 3d 301, 320 (S.D.N.Y. 2021).  Immunity as a defense can exist independently of whether there is a federal question that would allow the defendant to remove a case to federal court.

¶33      In determining whether a plaintiff's complaint raised a federal issue, the United States District Court for the Central District of California found that although the PREP Act was not an essential element of any of the plaintiff's state law claims, "nothing preclude[d] [d]efendants from raising PREP Act immunity defensively before a court of competent jurisdiction . . . ."  *Hopman v. Sunrise Villa Culver City*, No. 2:21-cv-01054-RGK-JEM, 2021 WL 1529964, at *6 (C.D. Cal. Apr. 16, 2021).  Notably, the United States District Court for the Western District of Texas recognized that "PREP Act immunity is a defense that must be pled in an answer or asserted in a motion to dismiss . . . ."  *Perez v. Se. SNF LLC*, 533 F. Supp. 3d 430, 436 (W.D. Tex. 2021).

¶34      The PREP Act is primarily an immunity statute.  *Mitchell v. Advanced HCS, LLC*, No. 4:21-cv-00155-P, 2021 WL 1247884, at *3 (N.D. Tex. Apr. 5, 2021).  It provides immunity to "covered persons" engaged in the administration of "covered countermeasures."  42 U.S.C. § 247d-6d(b)(1).  The Mayo Clinic defendants have asserted immunity under the Act.  But, although the superior court determined the Mayo Clinic defendants fall within the Act's definition of a "covered person," it failed to decide whether the actions that resulted in injuries to Roebuck fall within the Act's

11

definition of "covered countermeasures." Regardless of this omission, the record would not support such a finding.

¶35 While the Mayo Clinic defendants argue that "[a]ny diagnostic testing performed to assess, mitigate and treat the effects of COVID-19 during [Roebuck's] hospitalization would necessarily be a covered countermeasure under the Prep Act," the PREP Act requires more than that. According to the March 17, 2020 Declaration Under the Act, to qualify as a "covered countermeasure" under the Act, a countermeasure

> must be a "qualified pandemic or epidemic product," or a "security countermeasure," as described immediately below; or a drug, biological product or device authorized for emergency use in accordance with Sections 564, 564A, or 564B of the FD&C Act.

Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198-01, 2020 WL 1245193 (F.R.) (March 17, 2020).

¶36 The ABG procedure at issue here is not a "qualified pandemic or epidemic product," a "drug," a "biological product," or a "device." Under the Act, a qualifying countermeasure must also be one for which a declaration under subsection (b) of the Act has been issued. *See* 42 U.S.C. § 247d-6d(b)(1). The Mayo Clinic defendants have not argued, and we have found no support for the proposition that a declaration with respect to the ABG procedure was ever issued under subsection (b) of the Act.

¶37 We affirm the superior court's judgment that the PREP Act does not bar Roebuck's state law claims.

## CONCLUSION

¶38 For the foregoing reasons, we reverse the grant of summary judgment and remand to the superior court for further proceedings consistent with this decision.



AMY M. WOOD • Clerk of the Court
FILED: AA